[No. 31286.   Department Two.   October 9, 1950.]

WALTER J. LOSLI *et al., Respondents,* v. GEORGE FOSTER *et al., Respondents,* ARTHUR N. HEDSTROM, *Appellant.*[1]

[1]Reported in 222 P. (2d) 824.

*Theodore B. Bruener,* for appellant.

*A. D. Gillies,* for respondents Losli *et al.*

*Lester T. Parker,* for respondents Foster and Johnson.

HAMLEY, J.—This action involves the right of a builder to recover additional compensation from the owners of a dwelling, under the terms of a construction contract or on the basis of *quantum meruit.* It also involves the rights of three subcontractors as against the builder and the owners.

The action began as a suit in equity to foreclose certain liens filed by mechanics and materialmen in connection with the construction of a dwelling, and to secure personal judg-

ments against the owners and builder in the total sum of $2,508.73.

The builder denied personal liability on the claims, and cross-complained against the owners to recover an alleged unpaid balance in the sum of $2,725.86 on the construction contract. The builder also asked that if the plaintiffs recover judgment against him, he be granted judgment over against the owners, and that he be subrogated to any enforcible lien claims. The cross-complaint also sought recovery of $65.71 on the assigned claim of one C. H. Fulton, for certain painting work. The owners denied personal liability to either the plaintiffs or the builder, and denied the enforcibility of the liens.

The plaintiffs were Walter J. Losli, doing business as Smith & Losli, herein referred to as Losli; Kelly Westrom, doing business as Aberdeen Electric & Heating Company, herein referred to as Westrom; and Harry S. Elway. The defendants were Mr. and Mrs. George Foster, Mr. and Mrs. Basil Johnson, and Arthur N. Hedstrom. The Fosters are the owners of the dwelling in question, which was built on their lot in Aberdeen, Washington. Mrs. Johnson is Mrs. Foster's mother. She took an active part in the dealings with the builder and materialmen. The Johnsons also loaned money to the Fosters so that the construction bills could be paid as the work progressed. Hedstrom was the builder.

The testimony at the trial was in serious conflict on nearly every phase of the case. We have carefully examined the record, bearing in mind that the matter is before us for consideration *de novo*. The summary of facts set out below represents our appraisal of the evidence, after weighing the disputed testimony and considering the trial court's extensive memorandum opinion.

Mr. Foster is a logging truck driver and Mrs. Foster works as a waitress in her mother's cafe in Aberdeen. In December, 1947, the Fosters and Mrs. Johnson began looking at new homes in the Aberdeen-Hoquiam area. They became particularly interested in a house on Sumner avenue, in Hoquiam, which Hedstrom had built. He was present when

the Fosters and Mrs. Johnson inspected the house. He told them he hoped to sell the house for twelve thousand dollars. They liked the general arrangement of the house, but wanted somewhat larger rooms and preferred to locate in Aberdeen. Hedstrom suggested that the Fosters buy a lot and engage him to build a house for them. He is a master builder of considerable experience, and has erected some two hundred homes in the Grays Harbor area.

Following Hedstrom's suggestion, the Fosters bought a lot in one of the better residential districts of Aberdeen. They then called upon Hedstrom to arrange for the construction of the house. No detailed plans or specifications were prepared, and no written contract was entered into. A draftsman was engaged to prepare a floor plan and sketches. The understanding was that Hedstrom would then work out the construction details as the building progressed.

Both Hedstrom and the owners believed that they had entered into an oral contract covering the job. However, their versions of this contract differed widely. The Fosters understood that Hedstrom had agreed to build the house for the actual cost of labor and the retail cost of materials and supplies, the total cost not to exceed twelve thousand dollars. It was their understanding that, under this arrangement, Hedstrom would obtain his profit from discounts he would receive in the purchase of materials and supplies.

Hedstrom understood that the oral contract was an arrangement whereby Hedstrom would charge $2.75 an hour for labor and the retail price for materials. To this would be added ten per cent on both items until a profit margin of five or six hundred dollars had been built up. The ten per cent markup would then be discountinued. Hedstrom did not intend to set any guaranteed maximum cost figure. However, we are convinced from the evidence that he did estimate the total cost of the house, as first planned, at not to exceed twelve thousand dollars, not including the cost of painting and linoleum, and the extra cost of certain de luxe fixtures which were later added.

Hedstrom encouraged the Fosters to start construction in

the winter time, stating that he would then be more certain of a labor supply. Construction was begun on February 2, 1948. When Hedstrom presented his first bill to Mrs. Johnson, covering the period to March 15, 1948, she questioned whether he could build the house for twelve thousand dollars. Hedstrom then noted on the back of the bill some figures which appear to indicate that he then estimated the total cost of construction at $11,683, not including the excepted items already referred to. The $11,683 figure, however, apparently included a two-thousand-dollar item for lumber which was being supplied by the owners.

A month later, when the second bill was presented, Mrs. Johnson again expressed concern regarding the total cost of construction. As a result, Hedstrom arranged to have the materialmen send their bills directly to Mrs. Johnson, so that she could see that he was not receiving a discount. At this time Hedstrom also discontinued the ten per cent markup and reduced the labor charge from $2.75 an hour to $2.65, except in the case of the foreman. Hedstrom also acceded to the Fosters' request that they be permitted to subcontract certain parts of the work, in an effort to hold down costs. The Fosters, through Mrs. Johnson, paid Hedstrom's first two bills in full and two thousand dollars of the third bill, making a total of $10,160.95. The $685.04 balance on the third bill, and the final bill, in the sum of $2,040.82, have not been paid. The total of these, $2,725.86, is the amount sued for in Hedstrom's cross-complaint.

The house in question is of frame construction with siding and shingle roof. It has six rooms on one floor, including two bedrooms and a utility room. There is an unfinished upstairs, but no basement. Most of the rooms are comparatively large, and there is an attached two-car garage. Among the special features of the house are plate glass corner windows; mahogany mantel over the fireplace; built-in bookcases in the living room, and built-in china closet in the dining room; a wardrobe extending across one end of the master bedroom; de luxe plumbing fixtures; and covered front and back porches. Good quality materials were ap-

parently used in constructing the house, and the record reveals little criticism of the workmanship.

The record shows that, if Hedstrom's claim were allowed in full, the cost of constructing the house would be $19,596.64. This does not take into account the $233.67 discount Johnson obtained on the lumber, or the value of services performed by Foster around the construction job.

Costs may have been somewhat increased due to changes in the plans and materials as the work progressed. The evidence as to this was inconclusive, however, since some changes tended to increase costs while others tended to decrease them.

Labor costs were increased substantially because Hedstrom kept his crew on the job regardless of weather. The months of February and March, 1948, were exceptionally wet, and the efficiency of carpenters was reduced about fifty per cent on rainy days. Hedstrom testified that it was necessary to keep the crew on the job because the Fosters wanted possession of the house by June 1, 1948.

Other circumstances, revealed at the trial, undoubtedly tended to increase or inflate labor costs above what they normally would be. Hedstrom, for example, had included his own son among those receiving a journeyman carpenter's wage of $2.06½ an hour. Actually, the son was a so-called G.I. trainee to whom Hedstrom paid only $1.34 an hour. Hedstrom had no particular incentive to hold down labor costs, since he understood that a cost-plus contract was in effect. However, he did have a foreman in charge at all times, and was personally at the job from one to three times a day. The foreman's personal time records were not available at the time of the trial, so it was not possible to check the entries made in Hedstrom's books covering labor performed on the job. The trial court, in its memorandum opinion, summarized this aspect of the case as follows:

"The carpenters' labor cost charged on this job is grossly excessive. It seems to reach a total of $6,280.20. This figure of course does not include the labor in electric installation, plumbing installation, plastering, painting, fireplace, heat-

-ing or concrete driveway. If the builder was proceeding on the assumption that he was operating cost plus, he might be more lax in supervision. He had other jobs in progress, and it is apparent either through error or lack of supervision or other cause the carpenter labor charged on this job is erroneous and too high. Some errors of rather minor importance were pointed out at the trial."

With respect to the cost of materials supplied by Hedstrom from his own inventory, the testimony revealed a few minor overcharges due to errors in billing. A considerable. amount of work and material was supplied by various materialmen such as those who are plaintiffs in this case. The trial did not bring to light any specific overcharges by such materialmen. Nevertheless, Hedstrom's own testimony indicated a somewhat lax attitude on his part with respect to the pricing of labor and material supplied by subcontractors, in cases where the construction is proceeding on a cost-plus basis. Indicative of this attitude is the following excerpt from Hedstrom's testimony on cross-examination:

"Q. Let me get this. If you have a contract then you go around and get prices from the supplier? A. Yes. Q. If you don't have a contract you don't go around and ask the suppliers about the stuff? A. No, they don't overcharge. They charge the same rate all the time. If it is bigger they charge me more, and if it is smaller they charge me less. I don't need to ask them. I have dealt with them for 25 years. Q. But you do ask them if you have a contract? A. Naturally, because I have the plans and I want to know what has to be done. Q. But if you don't have a contract you just order the stuff and whatever it is you pay it? A. That is right. Q. It is the owner that pays the bill anyway? A. They do anyway in both cases."

Plaintiff Losli installed the oil-burning heating system, and the amount of his unpaid bill ($1,245.01) is not in dispute. The only question is whether Hedstrom represented that he was acting only as agent for the Fosters, or whether Losli was led to believe that Hedstrom was acting as an independent contractor in ordering the work. Hedstrom went to Losli's office and made the arrangements for the work with Losli's foreman, Robert L. Nelson. Hedstrom

told Nelson that he had a house to build for the Fosters, but did not state whether he had a contract. All three of the plaintiff materialmen performed on a time and material basis, and not pursuant to contracts for specified lump sum prices. During the work of installing the heating system, all of Losli's dealings were with Hedstrom. When the work was completed Losli sent the bill to Mrs. Johnson, in accordance with Hedstrom's request. Losli later went to see Mrs. Johnson about payment of the bill. Mrs. Johnson told him she had no objection to the bill, but her attorney had advised her not to pay it.

Plaintiff Westrom installed the electrical wiring, supplies and equipment. His bill, in the sum of $828.02, is not in dispute, but there is again the question as to whether Hedstrom represented that he was acting only as agent for the owners. Hedstrom called Westrom and asked him to meet Hedstrom and Mrs. Foster at the site of the job. Mrs. Foster was present at this meeting. She assisted in selecting locations for outlets and indicated the type of wiring and switches desired. This was in accordance with the customary practice on all of Westrom's jobs where there were no detailed specifications. Later, Mrs. Foster and her mother went to Westrom's store and selected lighting fixtures, chimes and a ventilating fan. Westrom testified that he never had any dealings with Hedstrom without Mrs. Foster also being present. Westrom's time and material slips refer to the "Hedstrom house," but, at Hedstrom's request, the bill was sent directly to the Fosters. When the bill was not paid, Westrom went to Mrs. Johnson and offered a ten per cent discount for immediate payment. Mrs. Johnson had no objection to the amount of the bill, but stated that her attorney had advised against paying it.

Plaintiff Elway installed the plumbing and plumbing fixtures. February and March, 1948, bills for roughed-in plumbing were submitted to Hedstrom and paid by him. Later, Mrs. Foster and Mrs. Johnson went to Elway's shop to select plumbing fixtures. The kind of fixtures selected required some changes in the roughed-in plumbing. Elway's

$435.70 bill for these fixtures and for the changes in the plumbing already installed was sent to the Fosters. Elway later talked to Mrs. Foster and Mrs. Johnson about payment of this bill. They had no objection to the amount of the bill, but declined to pay it for the same reason the Losli and Westrom bills had not been paid.

At the close of the trial, the court took the case under advisement. On October 4, 1949, the court issued its memorandum decision. Losli, Westrom and Elway were granted personal judgments against Hedstrom in the full amount of their claims. Losli was also granted full recovery against the Fosters, together with attorney's fees and costs in connection with Losli's lien, which was ordered foreclosed. Westrom was granted judgment against the Fosters in the sum of $444.02, together with attorney's fees and lien costs, and the lien in that amount was ordered foreclosed. Elway was granted judgment against the Fosters in the sum of $181.10, together with attorney's fees and lien costs. His lien in that amount was also ordered foreclosed. The case against the Johnsons was dismissed.

With respect to Hedstrom's cross-complaint against the Fosters, the court found that there had not been a meeting of minds as to the essential terms upon which the house was to be constructed. Accordingly, it was held that the elements of a contract were lacking. The court then decided the matter upon the theory of an implied contract, with recovery limited to the *quantum meruit*. It was found that the fair and reasonable value of all labor and materials going into the house (except the value of Foster's personal services) was $15,708.40. The Fosters had paid $14,296.34 of this sum, $10,160.95 of which had gone to Hedstrom. The balance of $1,412.06 was found to be owing to Hedstrom, and he was granted judgment against the Fosters in that amount. No disposition was made of the $65.71 Fulton claim which had been assigned to Hedstrom.

The court's calculation of $15,708.40, as the reasonable value of all labor and materials, includes the claims of Losli, Westrom and Elway. The court therefore held that

the Fosters might offset, against this $1,412.06 judgment granted Hedstrom, any amount they may pay these plaintiffs on their respective lien claims. It was further provided that in the event Hedstrom fails to pay the judgments rendered against him and in favor of the materialmen, together with costs and disbursements, and the same are enforced and collected by the materialmen from the Fosters, then the latter are granted judgment against Hedstrom by subrogation for any sums so paid over and above the sum of $1,412.06.

In so far as Hedstrom is concerned, the net result is this: He brought action against the Fosters on his cross-complaint for $2,725.86, representing the unpaid balance on his construction bills, and for $65.71 on the assigned Fulton claim, together with lien costs in the sum of $10.75 and attorney's fees in the sum of $350. All of these sums were, in effect, disallowed by the court, and judgment was rendered against Hedstrom for $1,348.85. Judgment was entered in accordance with the memorandum decision, and Hedstrom has appealed.

Appellant's first, second and fourth assignments of error bring into question those provisions of the judgment which, in effect, disallow appellant's $2,725.86 claim against the Fosters and grant a $1,348.85 judgment against appellant.

Appellant, for the purpose of the appeal, accepts the trial court's conclusion that the essential elements of a contract were lacking, and that the adjustment between the builder and owners must be on the basis of an implied contract. Appellant contends, however, that the court used a fundamentally wrong basis in fixing the *quantum meruit.*

Since this action began as a suit in equity, no findings of fact or conclusions of law were entered. The court's memorandum decision, however, discussed the case rather fully, and reveals the basis used by the court in arriving at an adjustment between the builder and owners.

The trial court apparently considered, as one of the controlling factors, its conclusion that the total costs contended for by appellant exceeded the market value of the

house as built. After concluding that the total cost of the house, if appellant's claim were to be allowed, would be "well over $20,000," the court said:

" . . . Could it be sold for a figure between $21,000.00 and $25,000.00? Is it worth any such sum?"

In the court's final computation, "probable reasonable value of the property" was named as one of the elements taken into consideration.

No evidence whatever as to the value of the completed house was received or tendered. The trial court examined the house but commented, in its decision, that it would be "presumptuous" for the court, from its examination alone, to attempt to fix the value. Since no evidence as to such value was received, we must conclude that the court should not have given weight to that factor in fixing the *quantum meruit*. It is not necessary for us to decide whether it would have been proper to receive and consider such evidence, had it been tendered.

█ A second consideration which apparently led the court to disallow appellant's claim was the thought that, under the circumstances of the case, the twelve-thousand-dollar estimate was in some way binding upon appellant. After referring to that estimate and comparing the experience of Hedstrom with the inexperience of the Fosters, the court said:

"Should the builder be permitted to evade an obligation in the nature of a guaranty?"

The Fosters had contended that the twelve-thousand-dollar estimate was in fact a stipulated maximum price binding upon appellant. The court rejected that view. Having thus concluded that there was no express contract between the parties, we do not believe that the estimate can be considered as having any binding force, as a "guaranty" or otherwise. It is, at most, evidence of the reasonable cost of constructing the house, to be considered along with all other evidence bearing upon that matter.

█ The trial court, accepting the twelve-thousand-dollar estimate as a basic figure, added twenty-five per cent

thereto and arrived at a total cost figure of $15,708.40. The explanation given for this method of computing total cost was as follows:

"Taking into account, all the circumstances, the probable reasonable value of the property, the alterations and builder's profit, allowance will be made of 25% additional on the original maximum cost."

We can find no basis in the record for this method of computing total costs. No witness testified that changes in the work, or other circumstances, called for an allowance of twenty-five per cent above the twelve-thousand-dollar figure, even assuming that figure to represent a definite estimate covering specified work. No witness, in fact, attempted to state over-all costs in terms of any per cent of any basic figure.

In view of what is said above, we feel that several inappropriate factors inhere in the computation made by the trial court. It is our conclusion, therefore, that the court used a fundamentally wrong basis in computing the *quantum meruit.*

██ This being a suit in equity which we are considering *de novo,* we should affirm if the decision of the trial court can soundly rest on any ground. *Rosenthal v. Tacoma,* 31 Wn. (2d) 32, 195 P. (2d) 102. In this connection counsel for the Fosters urges us to find that there was a binding contract involving a maximum price of twelve thousand dollars, even though the trial court held otherwise. An examination of the record convinces us that the trial court was correct in so ruling. There is doubt as to whether the twelve-thousand-dollar figure was intended to be binding, and in any event, there apparently was no meeting of the minds as to just what work was included within that estimate. There were no detailed building specifications, and even the general floor plan which was prepared was later changed in many respects. During the course of construction the initial arrangements were departed from, and the Fosters themselves handled some of the subcontracting. Moreover, the fact that the Fosters have already paid con-

siderably in excess of twelve thousand dollars indicates that they did not themselves treat the arrangement as a maximum-cost contract.

Counsel for the Fosters has also suggested that the twelve-thousand-dollar estimate constituted a fraudulent representation upon which the Fosters were entitled to rely. Here again, however, there is too much uncertainty as to what work was intended to be covered by the estimate to establish a claim of fraud. This being so, it is unnecessary for us to consider whether, in any event, a defense on the ground of fraud can be based upon a representation of this character.

In our opinion, the only evidence in this record upon which an award in *quantum meruit* can be based is that showing the actual cost to appellant of the labor and materials supplied.

Appellant acknowledges that, if his understanding of the contract is to be disregarded, the actual cost of the labor must be used in determining the *quantum meruit*. In his brief to this court, appellant has accordingly recomputed the labor item on an actual cost basis according to his books of account. By following this procedure, all excess hourly rates and all margins for profit are eliminated, and the item for labor is reduced from $6,280.20 to $5,113.62.

The charge for materials, including subcontracting items, building permits and miscellaneous charges, amounts to $5,488.53, after deducting $52.29 because of certain errors and discounts brought to light during the trial. The three per cent tax which appellant paid to the state of Washington on this job was $353.54. The total of these three items is $10,955.69.

Appellant asks us to add ten per cent of this total, or $1,095.60, to represent a reasonable profit. Appellant apparently represented to the Fosters at the outset, however, that he would be content with a profit of five or six hundred dollars.

Profit is an appropriate factor in determining the *quantum meruit* where there are no circumstances which call for its exclusion. We believe that such circumstances

are present here. We refer particularly to appellant's failure, as an experienced contractor, to more fully and carefully advise the Fosters as to the probable costs. The term *"quantum meruit"* literally means "as much as he deserved." 51 C. J. 116. Under all the circumstances of this case, we do not believe that any allowance for profit ought to be taken into consideration in determining the reasonable value of the work and materials supplied by Hedstrom.

We thus arrive at a figure of $10,955.69 as representing the total compensation to which appellant is entitled, exclusive of the claims of plaintiff materialmen. The Fosters have paid appellant $10,160.95. This leaves a balance due in the sum of $794.74. The full amount of the assigned Fulton claim ($65.71) should also be added. This claim was fully substantiated and does not seem to be seriously questioned. The Fulton claim is the subject of appellant's fifth assignment of error, but we will not discuss it further in this opinion.

Appellant is therefore entitled to judgment against the Fosters in the amount of $860.45, together with an attorney's fee of one hundred dollars and lien costs of $10.75 and costs to be taxed. The judgment, except for the $65.71 represented by the Fulton claim, should also be declared a lien upon the property on which the house is situated and, as such, foreclosed according to law.

Appellant's remaining assignment of error questions the action of the trial court in rendering personal judgment against him in favor of the plaintiff materialmen. The facts in connection with these transactions have been set out above. Appellant contends that the relation between the Fosters and appellant was that of principal and agent, and that this relationship was fully disclosed to Losli, Westrom and Elway.

It may be seriously questioned whether the relation between the Fosters and appellant was that of principal and agent, except for the purposes of establishing a lien against the property pursuant to Rem. Rev. Stat., § 1129 [P.P.C. § 180-1]. The relationship between the parties seems more

likely to have been that of owner and independent contractor. The rule which marks the dividing line between these two kinds of relationships is stated in Am. Jur., as follows:

"An independent contractor may be distinguished from an agent in that he is a person who contracts with another to do something for him, but who is not controlled or subject to the control of the other in the performance of such contract, but only as to the result. A principal, on the other hand, has the right to control the conduct of an agent with respect to matters intrusted to him." 2 Am. Jur. 17, Agency, § 8.

See, also, *Engler v. Seattle*, 40 Wash. 72, 82 Pac. 136; *Kendall v. Johnson*, 51 Wash. 477, 99 Pac. 310; *Johnston v. Taxicab Transfer Co.*, 85 Wash. 551, 148 Pac. 900; *Machenheimer v. Department of Labor & Industries*, 124 Wash. 259, 214 Pac. 17; Restatement, Agency, § 2 (3).

Here there was an implied contract under which appellant agreed to build the house in accordance with the floor plan and sketches in return for reasonable compensation. It does not appear that the Fosters exercised any control over appellant as to the manner in which the work was to progress. With respect to the materialmen in question, appellant in each case made the original contact and arranged for them to supply material and perform work as required. That appellant exercised his right as independent contractor to engage the subcontractors he preferred, is illustrated by Mr. Foster's undisputed testimony, as follows:

"Q. Was there any discussion at that time as to who was going to do the electric wiring, plumbing, or install the furnace? A. No, I left that up to Mr. Hedstrom. The only thing ever said about any of the tradesmen was we requested that A & F Electric wire the house, and Mr. Hedstrom went over their head and, I didn't understand at that time, Aberdeen Electric had changed hands; that Mr. Kelly Westrom was running it. I had previous experience from Aberdeen Electric, and I thought he overcharged me on a bill, and therefore I had preferred A & F Electric and Mr. Hedstrom informed me about Mr. Westrom, and he done all his work and wanted him to do that job, so I never had anymore to say about it."

But, assuming that the *actual* relationship between the Fosters and appellant was that of principal and agent,

it is quite clear that the *apparent* relationship, in so far as the suppliers were concerned, was that of owner and independent contractor. None of them knew the particulars of the arrangement between appellant and the Fosters. They had no reason to believe that in this case appellant was not acting in his normal role as independent contractor. Persons dealing with a building contractor have a right to rely upon the ostensible relations existing between the parties. *Patent Scaffolding Co. v. Roosevelt Apartments*, 171 Wash. 507, 18 P. (2d) 857.

The rights and liabilities as between the suppliers attached as of the time when the services of the suppliers were engaged. Where, as here, the circumstances surrounding the initial arrangement clearly establish the builder's liability to the suppliers, it is immaterial that the suppliers, at appellant's request, later sent bills to the Fosters or Mrs. Johnson, and sought to collect their bills directly from them. We conclude that judgment was properly entered in favor of Losli and Westrom against appellant.

In the case of Elway, however, we think a distinction must be drawn between the roughed-in plumbing, done in February and March, 1948, and paid for by Hedstrom, and the fixtures purchased several months later by the Fosters. It seems to us that these later purchases were separate from the original transaction. They were consummated after appellant had permitted the Fosters to take over part of the subcontracting in an effort to reduce expenses. As to these later purchases, the Fosters were acting upon their own account. There is no indication that Elway, who had already settled with appellant for the roughed-in plumbing, was looking to appellant for payment on these subsequent purchases and the work of installing them. Accordingly, personal judgment should not have been entered in favor of Elway against appellant, but should have run against the Fosters in the full amount sued upon.

The provisions of the judgment relative to the lien rights of Losli, Westrom and Elway against the Fosters are proper and should be incorporated in the new judgment to be entered.

In the event that the Fosters fail to pay the lien charges which have been established against them and in favor of Losli and Westrom, and if the same are enforced and collected against appellant by virtue of the judgments herein granted against appellant, then appellant should be granted judgment over and against the Fosters by subrogation for any and all sums so paid by appellant. In that event, appellant should be subrogated to any then existing lien rights of Losli and Westrom against the Fosters.

The judgment is reversed and remanded to the trial court, with instructions to enter a judgment in accordance with this opinion.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.

[1]Reported in 222 P. (2d) 817.