[No. 5090-1-II.   Division Two.   October 27, 1982.]

IRWIN CONCRETE, INC., ET AL, *Respondents,* V. SUN
COAST PROPERTIES, INC., ET AL, *Defendants,*
CONTINENTAL, INC., *Appellant,*
HERNANDO CHAVES,
*Respondent.*

*Gayle E. Bush,* for appellant.

*David J. Manger, Jerome R. Cronk, Ronald A. Roberts,* and *James E. O'Hern,* for respondents.

WORSWICK, J.—This litigation arose out of an unfortunate but familiar occurrence: a grand plan for real estate development gone awry.

In 1972, Olympic Mall Co. borrowed $350,000 from Continental, Inc., to purchase and develop 179 acres of land near Gig Harbor. A deed of trust secured the note. In April 1973, Olympic conveyed 7 of the 179 acres to Sun Coast Properties, Inc., to build a shopping center. The sale contract required Olympic to install a water system on its remaining 172 acres to provide water for the center. The water system was also intended to service additional development on the remaining property. Sun Coast then borrowed $1.5 million from Continental for completion of the center. In October 1973, Sun Coast sold the center site to Gig Harbor Properties, Inc., but continued active in construction of the center. Two months later, Sun Coast, Continental, and Traveler's Insurance Company entered into an agreement whereby Traveler's agreed to pay off Continental's construction loan and make a permanent loan to Sun Coast for $1.5 million upon completion of the center and Sun Coast agreed to prosecute completion of the center diligently.

By April 1974, Olympic was in default on its $350,000 loan from Continental and Continental notified the trustee of default. In September 1974, Continental gave notice of the trustee's sale of the 172 acres to all whose liens were then of record. While these foreclosure proceedings were in progress, Sun Coast, through its president, Michael Fizzolio, continued to let subcontracts for completion of the water system on the 172 acres. In December 1974, Irwin Concrete, Inc., began work pursuant to a contract with Fizzolio and on January 7, 1975, Fox Automatic Sprinkler

Systems, Inc., started work under a contract with Sun Coast Water Co., a corporation formed by Sun Coast Properties to complete the water system. David Davis performed work for Fox pursuant to an oral contract. All work pursuant to these contracts was done on various phases of the water system installed on the 172 acres.

At the trustee sale on January 24, 1975, Continental bid in and bought Olympic's interest in the 172 acres. Four days later the shopping center was finished and Traveler's paid off Continental's $1.5 million construction loan. In February 1975, Irwin, Fox, and Davis filed liens on all the land. A fourth claimant, Hernando Chaves and Associates, engineered the water system, working first for Olympic and later for Sun Coast. Chaves filed a lien on all the land on December 5, 1974. The fifth claimant, Active Construction, worked on the water system early in 1974 at the instance of Olympic.

By summary judgment, the trial court dismissed all liens but, after trial, awarded judgment in varying amounts in favor of all five claimants against Continental. Continental appeals. The claimants[1] cross–appeal dismissal of their liens. Primarily at issue is whether the trial court erred in awarding judgment against Continental based on unjust enrichment, in dismissing the liens, in denying prejudgment interest and in dismissing Chaves' promissory estoppel claim. Other satellite issues are also raised. We find no error and affirm.

### Unjust Enrichment

Although the liens were dismissed, the trial court nevertheless allowed a recovery to all claimants on the theory of unjust enrichment. Continental assigns error to this arguing that it did not request any work, that whatever specific benefit it might have received from completion of the shopping center was not proved and that the water system on which claimants worked operates at a loss and therefore

---

[1]Active did not appeal and did not respond to Continental's appeal.

constitutes no benefit. We disagree.

Under the doctrine of unjust enrichment, one who receives a benefit must pay for it only if the circumstances of its receipt or retention make it unjust for him to keep the benefit without paying. *Chandler v. Washington Toll Bridge Auth.,* 17 Wn.2d 591, 137 P.2d 97 (1943). A benefit includes any form of advantage. *Chandler,* 17 Wn.2d at 603. The trial court found that the claimants' work on the water system helped complete the shopping center thereby enabling Continental to close out its $1.5 million construction loan to Sun Coast, and also that the water system increased the value of the 172 acres Continental now owns.[2] These findings are supported by substantial evidence and will not be disturbed on appeal. *Hudson House, Inc. v. Rozman,* 82 Wn.2d 178, 509 P.2d 992, 61 A.L.R.3d 1163 (1973). Plainly, Continental received a substantial benefit because of the work. Would it be unjust to allow Continental to retain this benefit without paying? The trial court concluded it would be and we agree.

The trial court found that the claimants completed the water system at the urging and with consent of Continental, and that Continental knew about and silently acquiesced in the work when it was foreclosing its deed of trust. Substantial evidence also supports these findings. The record discloses, *inter alia,* that early in 1974, Continental told Chaves that he had to continue his work in order to receive loan funds. In February 1974, Walt Smith of Active Construction Co. worked on the 172 acres. Before Smith started work, David Ballaine of Continental told him that loan funds from Continental to pay for Smith's work were secure. Late in 1974, Continental knew that Chaves was still certifying work by subcontractors. Continental knew that Irwin, Fox and Davis were working on the water system because Chaves certified their completed work. We

---

[2]Continental's argument that the system now *operates* at a loss begs the question. Continental does not come to grips with the trial court's conclusion that the *value* of the land is enhanced by a water system.

conclude that under these circumstances it would be unjust for Continental to receive the benefit of the claimants' work without paying.

## DAMAGES

■ Continental asserts that the trial court erred in awarding damages measured by contract prices, arguing that the correct measure is the value conferred. The argument is correct as far as it goes but that is not far enough, because it simply does not follow that a contract price cannot represent that value. A claim for unjust enrichment is a quasi–contractual claim. *Bill v. Gattavara,* 34 Wn.2d 645, 209 P.2d 457 (1949). Quantum meruit—"a reasonable amount for the work done"—is the measure of recovery. *Heaton v. Imus,* 93 Wn.2d 249, 252–53, 608 P.2d 631 (1980). The only evidence presented was that of the various contract prices. It was not error, therefore, for the trial court to conclude, as it did, that the contract prices represented the value of the work in making a quantum meruit award. *See Losli v. Foster,* 37 Wn.2d 220, 222 P.2d 824 (1950).

## LIENS

Irwin, Fox, Davis and Chaves cross–appeal from a summary judgment dismissing their liens. At the threshold of our discussion we emphasize the obvious distinction between a lien, which provides security for a claim, and the underlying claim itself. *See* RCW 60.04.180. This is necessary because the claimants, in advancing their contentions, appear to confuse these concepts. The trial court's ultimate judgment was based on the underlying claims.

## I
## THE 172 ACRES

■ The lien claims in question were filed under the provisions of RCW 60.04.010, which authorizes a mechanic's lien for work performed "at the instance of the owner of the property . . . or his agent; . . ." RCW 60.04.030 allows a lien "to the extent of the interest of the . . . company, who

in . . . its own behalf, or who, through any of the persons designated in RCW 60.04.010 to be agent of the owner . . . caused the performance of the labor . . ." The agents so designated by RCW 60.04.010 are "every registered or licensed contractor, registered or licensed subcontractor, architect, or person having charge, of the construction . . ." Continental never caused the performance of any labor by Irwin, Fox or Davis. Chaves seems to suggest that Continental caused him to perform work but, except for the estoppel claim discussed below, Chaves claims no lien on Continental's interest.[3] The deed of trust foreclosure operated to deprive Olympic of any interest in the land (*see* RCW 61.24.030(6)(i)) and, to the extent that Olympic or its agents requested the work, also operated to extinguish the liens. *See W.T. Watts, Inc. v. Sherrer,* 89 Wn.2d 245, 571 P.2d 203 (1977).[4]

However, Irwin, Fox and Davis assert that a fact question existed which required denial of the summary judgment. They argue that Fizzolio could have been found to be the agent of Continental and thus, under the lien statute, the liens could have attached to Continental's interest in the property. We disagree. The summary judgment record is devoid of any facts which would support the conclusion that Fizzolio was ever Continental's agent for any purpose.

## II
### CHAVES CLAIM OF PRIORITY

Chaves contends that his lien was not foreclosed by the trustee sale because it was senior to that of Continental.[5] He argues that the loan agreement between Continental

---

[3]Thus, we do not discuss the question of whether a security interest is lienable.

[4]No contention is made here that a surplus was created at the sale which might have been subject to the liens. *See* RCW 61.24.080(3).

[5]His related argument that he was entitled to notice of the sale is clearly without merit. At the time of the sale he had not recorded a lien claim. RCW 61.24.040(1)(b). His case citations are inapposite.

and Olympic made advances optional with Continental; thus, he claims, to the extent of monies advanced after he started work, his lien claim was senior, citing *National Bank v. Equity Investors,* 81 Wn.2d 886, 506 P.2d 20 (1973). We disagree.

Chaves cites *Equity Investors* for the correct proposition but he does not come within it. In *Equity Investors,* the court restated the Washington rule that a mortgage to secure future advances takes priority over mechanic's liens accruing after recording of the mortgage, unless the future advances are optional. Where the advances are optional, priority is determined when the advances are made.[6] *Equity Investors,* 81 Wn.2d at 897. The court found that the bank's advances to Equity Investors were optional, because the bank had discretion whether to disburse funds or not, and could not have been compelled by court decree to advance any money. The court came to this conclusion based on language in the contract which stated that money would be advanced to Equity Investors, "'. . . *at such times and in such amounts as the Lender shall determine.'*" 81 Wn.2d at 898. The court stated:

> Although in a given case there may be difficulty in ascertaining from the circumstances and the language of the mortgage and loan papers covering the whole agreement whether the advances are to be regarded as optional or mandatory, we think that the contractual reservations giving the lender the broad discretion of deciding when and in what amounts, *or if at all,* he must advance the money render the advances optional rather

---

[6] In 1973, the Legislature changed the priority rules for interim or construction financing by adding the following section to the mechanic's lien chapter:

> Except as provided in RCW 60.04.050 or in RCW 60.04.200 through 60.04-.220 any mortgage or deed of trust shall be prior to all liens, mortgages, deeds of trust and other encumbrances which have not been recorded prior to the recording of such mortgage or deed of trust to the extent of all sums secured by such mortgage or deed of trust regardless of when the same are disbursed or whether such disbursements are obligatory.

RCW 60.04.220.

RCW 60.04.220 does not apply to this case, because it became effective after Continental's deed of trust was filed.

than obligatory where the purpose is to decide construction lien priorities arising after the initial filing for record of the lender's security documents.

81 Wn.2d at 899.

■ Unlike *Equity Investors,* the contract between Continental and Olympic did not allow Continental to disburse funds based on its own criteria. Subsection (2)(c) of the contract stated:

> The remaining $80,000 shall be disbursed after said lease to a national retail grocery chain has been secured and approved by Continental, for the purpose of site developments, plans for which shall be approved by Continental, and disbursements for which shall be made monthly against actual development costs, based on cost verification as site preparation progresses. Disbursements hereunder shall be subject to approval of Continental.

Disbursements were subject to Continental's approval. However, Continental was not free to advance or retain the money as it saw fit. The quoted language specifies the conditions under which Continental could approve or disapprove of disbursements: "disbursements for which shall be made monthly against actual development costs, based on cost verification as site preparation progresses." Continental's control over disbursements was limited to verifying each advance requested for the cost of work completed on the land. If the amount requested of Continental was verified, Continental had no option, but was required to disburse the money. Continental was obligated to loan $350,000 to Olympic. The only control Continental had over future advances was the ability to see that Olympic spent the loan money for improvements to the land. That control did not render the future advances optional.

Because Continental's advances were mandatory, its deed of trust securing the future advances was perfected on June 9, 1972, the date of filing. Chaves' mechanic's lien arose on June 16, 1972, the date he commenced work, and consequently was junior to the deed of trust.

## III
### REMOVAL OF IMPROVEMENTS

Irwin, Fox and Davis contend that because the trial court dismissed their liens on the 172 acres, it was required under RCW 60.04.170 to order the sale and removal of the improvements they placed on the land. This contention is incorrect. RCW 60.04.170 permits but does not require the court to order the sale and removal of improvements when the underlying land cannot be subjected to a lien. Before the court may order the removal, however, the claimants must prove that the improvements are removable without injury to the freehold. *Pioneer Sand & Gravel Co. v. Hedlund,* 178 Wash. 273, 277, 34 P.2d 878 (1934). The improvements in this case involved concrete holding tanks for water, and underground water pipes. Nothing in the record indicates that these improvements were removable without injury to the land. Claimants failed to sustain their burden.

## IV
### LIEN ON SHOPPING CENTER

RCW 60.04.010 provides that "Every person performing labor upon . . . any . . . well . . . has a lien *upon the same* for the labor performed, . . ." (Italics ours.) In determining whether a lien exists, the statute will be strictly construed so as not to extend its benefit to those who do not clearly come within its terms. *Dean v. McFarland,* 81 Wn.2d 215, 500 P.2d 1244 (1972). The claimants contend simply that they should have a lien on the shopping center because work they performed on the 172 acres benefited the center. This contention is without merit. RCW 60.04.010 grants a lien only upon the property upon which the work was performed. Washington cases cited by the claimants involved single tracts of land rather than separate tracts owned by different people. At the time of this work, the center was a separate parcel in separate ownership from the land upon which the work was done.

## V
## CHAVES ESTOPPEL CLAIM

Chaves contends that he is entitled to a lien because of estoppel. He claims here that he intended throughout to rely on equitable estoppel. The trial court dismissed this claim on motion at the end of Chaves' case. CR 41.

■ The record belies Chaves' contention. Throughout the trial he consistently argued promissory estoppel, the first prerequisite of which is a promise. *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 424 P.2d 290 (1967). Chaves testified at trial that Continental never promised to pay him for his work. Consequently, the trial court's ruling was correct.

A theory not presented at trial will not be considered on appeal. *Lee v. Cloes*, 80 Wn.2d 783, 498 P.2d 323 (1972). We will not disturb the trial court's ruling on this issue.

## PREJUDGMENT INTEREST

■ The claimants contend that prejudgment interest should have been awarded on their unjust enrichment claim. We disagree. Prejudgment interest may be recovered only if a claim is liquidated or is for an amount which is determinable by computation with reference to a fixed standard without reliance on opinion or discretion. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968). It is the character of the original claim, rather than the court's ultimate method for awarding damages, that determines whether prejudgment interest is allowable. *See Prier*, at 33. Here, the claim and resulting award were based upon quantum meruit. Prejudgment interest is not allowable in a quantum meruit case. *Modern Builders, Inc. v. Manke*, 27 Wn. App. 86, 615 P.2d 1332 (1980).

## ATTORNEY'S FEES

RCW 60.04.130 authorizes the trial court to award attorney's fees to the prevailing party in a lien foreclosure action. The trial court awarded attorney's fees to Gig Harbor Properties, Ltd., Western Diversified Equities and Traveler's Insurance Company. We affirm that award. Because Gig Harbor Properties and Traveler's have pre-

vailed on the cross appeal and have complied with RAP 18.1, they are entitled to attorney's fees here. Therefore, we award attorney's fees for the appeal in the amounts of $1,742.50 to Gig Harbor Properties and $3,600 to Traveler's against cross appellants Irwin, Fox, Davis and Chaves.

Affirmed.

PETRICH, A.C.J., and PETRIE, J., concur.

Reconsideration denied November 17 and 30, 1982.