254 P.3d 835 (2011)
161 Wash.App. 474
FIRST AMERICAN TITLE INSURANCE COMPANY, Appellant,[*]
v.
LIBERTY CAPITAL STARPOINT EQUITY FUND, LLC; Respondent.
Norcon Builders, LLC, a Washington limited liability company, Plaintiff,
v.
GMP Homes VG, LLC; Insaf Oraivej; Ward A. Baugher, Jr. and Grace Baugher, individually and the marital community composed therein; Jeffrey D. and Alice Abercrombie, individually and the marital community composed therein; Starpoint Shops, LLC; Carolyn L. Mcintosh; Linda D. Raymond; Barbara A. Garcia; Kyle M. Yasui; Larry K. Ragun and Kathleen Leavitt, individually and the marital community composed therein; David and Margaret Jobe, individually and the marital community composed therein; Sarah Ninteman; Hironori D. and Yoshikazu Jo, individually and the marital community composed therein; Yibeltal Abdi and Elnata Degefa, individually and the marital community composed therein; David L. Island and Maria Zimena Bernal, individually and the marital community composed therein; Britton T. Whitworth; Hillary J.H. and Steven C. Lambert, individually and the marital community composed therein; Jeremy D. and Amy B. Martin, individually and the marital community composed therein; Leroy A. Maxwell; Derovanessian Holdings, LLC, a Washington limited liability company; R. Greg Prendergast and Maria Prendergast, individually and the marital community composed therein; Corrine L. Deal; Christopher J. Hart; Laurene Ann Poythress and Albert Douglas Dyer, individually and the marital community composed therein; Annie Junye Liu and Kien Kit Ho, individually and the marital community composed therein; William P. Gabel; Wei Zheng Chen and Qi-Na Zhao, individually and the marital community composed therein; Ellen Bally; Erwin T. Lam; Elsa M. Benitez; Karen Paulsell; Lisa Lee Moritz; Danita F. Jolly; Michael Jerome Hull; Janette C. Little and Mark G. Thomas, individually and the marital community composed therein; Tamara L. and Tyler S. Johnson, individually and the marital community composed therein; Jeramy D. Koepping and Elizabeth A. Green, individually and the marital community composed therein; Heidi M. Anderson; Jenny L. Seelenbacher; Bruce G. Yan; Daniel and Neda Stoll, individually and the marital community composed therein; SZ-Tsung Sun and Chao-Jung Hung, individually and the marital community composed therein; Andrew W. Mahon; Charles S. Mahon and Jennifer J. Mahon, individually and the marital community composed therein; Ki H. Hong; Saiyed Raza Abbas Naqvi and Syeda Mehwish Tahira Naqvi, individually and the marital community composed therein; Philip V. Palios; Lori K. Becker; Kirsten Grumet; Sampurna Sen and Ram Sankar Das, individually and the marital community composed therein; Wei David Zhang; Patrick K. Reilly; Asif Jabbar; Sohail K. Mirza and Atiyya S. Mirza, individually and the marital community composed therein; Susan E. Camicia; Nina A. Yurakova; Turnkey Properties, Inc.; Ashley Naranjo; David L. Jeffery; Brian Martinez and Stacey Martinez, individually and the marital community composed therein; Helen Elise Tanner; Frontier Bank; Grand-Glacier, LLC; Michael R. Mastro; Merit Mechanical, Inc.; 3D Roof Systems, LLC; Miller Condominium Marketing, LLC; James Stiles and Daniela Stiles, husband and wife; Washington Mutual Bank; JP Morgan Chase Bank, NA; Quick Mortgage Services, LLC; Home Funding Central, Inc.; Liberty Financial Group, Inc.; Linda Rose; First National Home Mortgage, *836 now known as Northwest Mortgage Advisors, Inc.; Bank of America, NA; Sun Trust Mortgage, Inc.; Mortgage Master, Inc.; Countrywide Bank FSB; Lo, Inc., DBA Reliance Mortgage, Inc.; Dhi Mortgage Company, Ltd.; Homestead Mortgage, Inc.; State of Washington; Boeing Employees' Credit Union; US Bank, NA; Eagle Home Mortgage, LLC; The Washington State Housing Finance Commission; North West Mortgage Alliance; Flagstar Bank, FSB; Amtrust Bank; Mortgage Electronic Registration Systems, Inc., Defendants,
No. 65251-6-I-I.
Court of Appeals of Washington, Division 1.
February 28, 2011.
Publication Ordered May 5, 2011.
*838 Ann T. Marshall, Kennard M. Goodman, Bishop White Marshall & Weibel PS, Michael B. King, James E. Lobsenz, Carne Badley Spellman, Seattle, WA, John T. Ludlow, Hanson Baker Ludlow Drumheller PS, Bellevue, WA, for Appellant.
Douglas S. Oles, Arthur D. McGarry, Oles Morrison Rinker & Baker LLP, Christopher B. Butler, Attorney at Law, Seattle, WA, for Respondent.
LAU, J.
¶ 1 Following escrow agent First American's failure to secure the release of secondary construction lender Liberty Capital's deed of trust on the sale of five condominium units, Liberty gave notice of intent to nonjudicially foreclose its deed of trust on those units. The unit owners (UOs) appeal the trial court rulings (1) dismissing the quiet title action, (2) dissolving the preliminary injunction, and (3) authorizing nonjudicial foreclosure against their units. They argue (1) title to their units should be quieted in them based on equitable estoppel, (2) a constructive trust should be imposed for the value of their units based on unjust enrichment, and (3) in the alternative, both the UOs and their lenders should be equitably subrogated to the primary lender's first priority position for the purchase price of their units. Because the UOs fail to establish relief under equitable estoppel and unjust enrichment and because equitable subrogation would result in material prejudice to Liberty, we affirm the trial court rulings.

*839 FACTS

¶ 2 Owner/developer GMP Homes developed the Starpoint Condominiums in 2006 and 2007 on two parcels of land in Issaquah. To finance construction, GMP borrowed $26 million from Frontier Bank. Norcon Builders, LLC, the prime contractor, began construction on the project in the first half of 2006. By July 2006, GMP needed additional construction financing and borrowed $1.9 million from Liberty.[1] After selling 88 of the 98 units (including the five units that are the subject of this appeal), GMP became insolvent. Frontier, Norcon, and Liberty were each left unpaid.
¶ 3 The Frontier, Norcon, and Liberty loans were all secured by liens against the project property and units. Except for the five units at issue in this appeal, the creditors' priority was as follows:
¶ 4 First-place priorityFrontier, with a claim against all unsold units based on its partial deed that was released with each sold unit.
¶ 5 Second-place priorityNorcon, based on its mechanic's lien with a claim against all sold or unsold units.
¶ 6 Third-place priorityLiberty, as a secondary lender with a claim against all unsold units based on its deeds of trust. FF 3-4, 12-13, 59-60.
¶ 7 Liberty's 2006 loan agreement[2] contemplated that it would receive a "zero payout" on the sales of the first 75 units, with most of the sale price going to pay down Frontier's superior deed of trust. The agreement allowed for such a procedure "[p]rovided Borrower is not in default . . . and the obligation in favor of Frontier Bank is being reduced at a rate that will amortize such indedebtedness over the course of the first seventy-five (75) Condominium Unit closings." Ex. 107 at 1. This arrangement would leave proceeds from the final 23 sales available to pay Liberty.
¶ 8 "Beginning with the first Starpoint unit sale on or about July 30, 2007 . . . First American . . . implemented a standard practice for securing Liberty Capital's approval for each unit sale." FF 22.[3] In order to close a sale at Starpoint, escrow agent First American would "ask[] Liberty Capital's [manager,] David Dammarell to `email or fax me a notice that you're collecting $0.00 on this payoff.'" FF 22 (quoting Ex. 223); RP (Jan. 12, 2010) at 31. And First American "needed Liberty Capital's approval on each closing [and] to confirm that Liberty was in agreement regarding how [the closing agent] would distribute the sale proceeds from each closing." FF 24. That agreement was required to be in writing. FF 31. Liberty describes the process:
(1) prior to sale closing, (2) First American requested in writing Liberty's approval of the sale and provided Liberty with a written HUD [Department of Housing and Urban Development] statement indicating the proposed disposition of sale proceeds, (3) which disposition Liberty either conditionally or unconditionally (or, alternatively, not at all) approved, (4) in writing by a confirmatory email sent prior to sale closing.

Br. of Respondent at 3 (footnote omitted). This description is consistent with Dammarell's testimony describing the closing process:
"Ms. Warthan [of First American[4]] would email me a HUD 1 statement, or I would *840 be cc'd on a HUD 1 statement, and we would review, and if we approved the financial terms of that, then I would email back and say, we are owed zero on this transaction."
RP (Jan. 13, 2009) at 153.
¶ 9 In all of the Starpoint sales, except those involving the UOs condominiums,[5] First American requested and received the agreement of Frontier and Liberty to a partial reconveyance of their deeds of trust prior to the closing on each unit. But in the sales of the UOs condominiums,[6] in August and September of 2007, First American failed to ask for or obtain Liberty's consent to reconvey their deed of trust. The trial court found "by a preponderance of the evidence that First American closed the five disputed closings without receiving any prior approval from Liberty Capital." FF 53.
¶ 10 On October 9, 2008, Liberty sent an e-mail to First American asking that it provide a full list of sold units because it did not have complete and accurate records. FF 50 (citing Ex. 237). After reviewing First American's list of sold units, Dammarell informed First American that there were discrepancies between Liberty's list of approved sales and First American's. FF 51. The trial court found that the "earliest time at which [Liberty] understood that it had not provided approvals for the five unit sales" was October 2008.[7] FF 45. Liberty maintained that it had not approved a deed reconveyance for the five units and it therefore asked First American to purchase its note. FF 54.
¶ 11 Meanwhile, on July 18, 2008, Norcon filed this lawsuit to foreclose on its mechanic's lien against Starpoint.[8] CP at 1-33. On September 19, 2008, Norcon obtained an $821,270.39 default judgment against GMP. CP at 76-78 (Ex. 116). In August 2009, to protect its priority position, Liberty borrowed money to pay off the balance on the Frontier loan. FF 46, Ex. 253, Ex. 255. Thus, after Liberty paid off Frontier's outstanding loan balance, the creditors' priority for the UOs' condominiums was (1) Norcon, (2) Liberty, (3) the UOs' mortgage lenders, and (4) the UOs. In October 2009, First American agreed to pay Norcon $670,000 to release its lien against 72 sold units, including the UOs' five units. Ex. 146. Seeking again to protect its position, Liberty agreed to purchase the Norcon lien through a May 26, 2009 settlement agreement that provided for an up-front lump sum payment of $300,000 and monthly payments of $50,000 beginning in July 2009. FF 56, Ex. 114 at ¶¶ 3.1, 3.3. On March 18, 2010, after crediting First American's payment and other monies received, the court entered a $174,870.72 foreclosure judgment on Norcon's lien. CP at 1870-75. That judgment is now in Liberty's name as Norcon's successor-in-interest. CP at 1873-74. Accordingly, the current priority is (1) Liberty, (2) the UOs mortgage lenders, and (3) the UOs.
¶ 12 Meanwhile, Liberty gave notice of nonjudicial foreclosure of its deed of trust and trustees sale, which was set for June 5, 2009. The UOs filed a third party complaint in the Norcon lawsuit seeking injunctive relief to prevent the foreclosure sale against their units. CP at 272-75. Prior to the trustee's sale, the trial court granted the UOs' request for a temporary restraining order on June 3 and a preliminary injunction on June 19, pending discovery and trial. In August 2009, the UOs amended their complaint to include a claim to quiet title in their units on the grounds of equitable estoppel, *841 unjust enrichment, and because "Liberty Capital either expressly or impliedly agreed to partially reconvey" its deeds of trust. CP at 705. The parties cross moved for summary judgment and the trial court denied both motions in December 2009.
¶ 13 The case was tried in a six-day bench trial in January 2010. After trial, on February 12, the court entered extensive written findings of fact and conclusions of law. On March 18, the court dissolved the preliminary injunction, authorized nonjudicial foreclosure against the UOs' units, and dismissed their quiet title claim. The court also denied the UOs' motion to amend the findings of fact and conclusions of law and to declare that Liberty's deed of trust should be subordinate to the UOs' lenders' deeds of trust.

STANDARD OF REVIEW
¶ 14 The UOs seek relief under principles of equity. "`[T]he question of whether equitable relief is appropriate is a question of law,' and like all issues of law ... review is de novo." Bank of Am., NA v. Prestance Corp., 160 Wash.2d 560, 564, 160 P.3d 17 (2007) (citation omitted) (quoting Niemann v. Vaughn Cmty. Church, 154 Wash.2d 365, 374, 113 P.3d 463 (2005)). We treat unchallenged findings as verities on appeal. Zunino v. Rajewski, 140 Wash.App. 215, 220, 165 P.3d 57 (2007).

DISCUSSION
¶ 15 The UOs assert three equitable arguments for reversal. They maintain that (1) equitable estoppel principles entitle them to have title to their units quieted in them, (2) a constructive trust should be imposed for the value of their units on the ground of unjust enrichment, and (3) in the alternative, the UOs and their lenders should be equitably subrogated to Frontier's first priority position for the purchase price of their units. Finally, the UOs challenge 13 findings of fact and 6 conclusions of law.[9]

I. Equitable Estoppel

¶ 16 The UOs first argue that title to their five units should be quieted in them and that Liberty's deed of trust should be extinguished based on equitable estoppel principles. Liberty maintains that the UOs cannot satisfy any of the three equitable estoppel elements.
¶ 17 Equitable estoppel is based on the view that "`a party should be held to a representation made or position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon.'" Lybbert v. Grant County, 141 Wash.2d 29, 35, 1 P.3d 1124 (2000) (quoting Kramarevcky v. Dep't of Soc. & Health Servs., 122 Wash.2d 738, 743, 863 P.2d 535 (1993)). Equitable estoppel requires three elements:
"(1) an admission, statement or act inconsistent with a claim afterwards asserted, (2) action by another in [reasonable] reliance upon that act, statement or admission, and (3) injury to the relying party from allowing the first party to contradict or repudiate the prior act, statement or admission."
Lybbert, 141 Wash.2d at 35, 1 P.3d 1124 (quoting Bd. of Regents v. City of Seattle, 108 Wash.2d 545, 551, 741 P.2d 11 (1987)). Equitable estoppel is not a favored doctrine, so each element must be shown by clear, cogent, and convincing evidence. Colonial Imports, Inc. v. Carlton Nw., Inc., 121 Wash.2d 726, 734, 853 P.2d 913 (1993). The party asserting the defense must have clean handsbe free from fault in the transaction at issue. Kramarevcky, 122 Wash.2d at 743 n. 1, 863 P.2d 535
¶ 18 As to the first equitable estoppel element, the UOs advance two arguments to show Liberty made "`an admission, statement or act inconsistent with a claim afterwards asserted....'" Lybbert, 141 Wash.2d at 35, 1 P.3d 1124 (quoting Bd. of Regents, 108 Wash.2d at 556, 741 P.2d 11). First, they argue that Liberty's current assertion of a deed of trust is inconsistent with its *842 prior approval of Starpoint sales "[b]ecause... sales [of the UOs' units] and closings ... advanced Liberty Capital's financial interest in seeing Frontier's senior lien paid down and extinguished, just as had the other 62 sales of whose closings Liberty had expressly approved." Br. of Appellant at 38. In essence, they argue that Liberty would have approved the UOs' sales if First American had consulted Liberty and, therefore, Liberty's foreclosure of its deed of trust is an inconsistent action. Second, they argue that Liberty's silence despite evidence of the UOs' unit closings constitutes an inconsistent act.
¶ 19 As to the first argument, there is nothing inconsistent with agreeing to a written approval process for Starpoint sales, approving 62 sales pursuant to that mutually agreed process, and foreclosing on units when First American failed to follow that approval process. First American and Liberty negotiated a detailed approval process that consisted of written requests from First American and required a corresponding written approval by Liberty. This approval process protected Liberty's interests by allowing it to ensure that unit sale prices were adequate to pay down the Frontier debt at a sufficient rate such that Liberty could recoup its loan through the sales of the last 23 units. Liberty was entitled to insist that First American use that process when closing Starpoint sales and is entitled to assert its secured creditor rights when it was not followed.
¶ 20 The UOs claimed inconsistency is further undermined because Liberty had valid reasons to question the disputed closings. The trial court's undisputed findings of fact establish that Liberty representatives testified to several problems with the disputed closings. Dammarell testified "that he would not have approved distributing $12,895 to GMP Homes IH, LLC on the sale of unit N-205 if he had seen the draft Settlement Statement prior to closing" because, according to GMP principal[10] Greg Prendergast, GMP Homes IH, LLC was a separate entity from GMP Homes VG, LLCthe Starpoint developerand "was not supposed to receive any proceeds from Starpoint sales." FF 41 (citing Ex. 161 at 3). Dammarell further testified that "he would have questioned distributing $13,445 to GMP Homes VG LLC on the sale of unit N-209...." FF 42 (citing Ex. 162 at 3). Prendergast also corroborated Dammarell's testimony "by acknowledging that GMP should not have been receiving proceeds from unit closings before the secured loans were paid off." FF 42. Dammarell also testified that "he would have questioned distributing $750 to First American for errors in calculating commissions for units N-401 and N-304 from the proceeds of selling unit N-213 [because] these distributions were not shown on the draft HUD-1 Settlement Statement that First American claims to have sent to Liberty Capital." FF 43 (citing Ex. 13 at 3; Ex. 164 at 3).
¶ 21 While the UOs correctly note that Dammarell could not testify that he would not have approved the sales, neither did he testify that he would have. "I may have signed off, but I don't know. I wasn't given the opportunity...." RP (Jan. 14, 2010) at 69. Furthermore, the UOs' allegations lack evidentiary or legal support-their argument on the first estoppel element does not contain a single citation to the record or legal authority.[11] We will not consider an inadequately briefed argument. See Bohn v. Cody, 119 Wash.2d 357, 368, 832 P.2d 71 (1992) (appellate court will not consider inadequately briefed argument); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by citation to the record or authority will not be considered); RAP 10.3(a)(6). In sum, Liberty's prior approvals of Starpoint sales pursuant to the agreed approval process is not inconsistent with its assertion of secured creditor rights to units sold in derogation of that approval process.
¶ 22 And there is no evidence that the UOs knew about Liberty's approval of the prior *843 Starpoint sales and relied on it when purchasing their units. "The second element of the three-part equitable estoppel test requires the party asserting estoppel to show that he reasonably relied to his detriment on an act, admission, or statement of the party to be estopped." Sorenson v. Pyeatt, 158 Wash.2d 523, 540, 146 P.3d 1172 (2006). The UOs assert that they "relied on the process GMP, Frontier, First American, and Liberty Capital followed in 2007 ..." Br. of Appellant at 44. But the UOs fail to explain how they relied on that course of conduct or cite to any support in the record establishing that reliance. And
Ms. Warthan, the only person in direct communication with Liberty Capital during the period of the disputed closings, did not claim to have relied on any oral agreements to reconvey Liberty's deed of trust; instead, she acknowledged that she needed Liberty's written approval for each closing and insisted that she must have had such approvals back in 2007.[[12]]
Conclusion of Law 6. Warthan's admission that she needed written approval for "each closing" conclusively establishes that neither First American nor the UOs relied on Liberty's prior approvals.
¶ 23 The same is true of the UOs' second alleged inconsistent act by Liberty. The UOs argue that "Liberty's failure to speak up when it would have reasonably been expected to do so in order to protect its interests" constitutes "`an admission, statement or act inconsistent with a claim afterwards asserted.'" Br. of Appellant at 40 (quoting Lybbert, 141 Wash.2d at 35, 1 P.3d 1124). While "[s]ilence can lead to equitable estoppel," the "conduct relied on to raise the estoppel must have been concurrent with or anterior to the action which they are alleged to have influenced." Peckham v. Milroy, 104 Wash.App. 887, 892-93, 17 P.3d 1256 (2001); Elmonte Inv. Co. v. Schafer Bros. Logging Co., 192 Wash. 1, 33, 72 P.2d 311 (1937) (emphasis omitted) (cited with approval in Sorenson, 158 Wash.2d at 540, 146 P.3d 1172). That is, "[i]t is essential to an equitable estoppel that the person asserting the estoppel changed his position in reliance upon the representations or conduct of the party sought to be stopped." Sorenson, 158 Wash.2d at 540, 146 P.3d 1172.
¶ 24 Here the UOs argue that Liberty knew about the five disputed sales in August 2007.
In August 2007, Liberty Capital received specific written notice by unit number, sale price, and purchaser's name that four of the five Unit Owners sales had closed and that the fifth was poised to close in September 2007.... If Liberty Capital were concerned about protecting its interest in its deed of trust and compliance with the Liberty Capital-GMP loan agreement, the first time that Liberty could have caught the oversight, and raised it with GMP and First American and explored ways to correct it, was in August 2007.
Br. of Appellant at 41 (emphasis added). But this argument acknowledges that Liberty did not know about the sales until after "four of the five Unit Owners sales had closed." Br. of Appellant at 41. Moreover, the trial court's unchallenged finding of fact 45 establishes that Liberty did not learn about the unapproved closings until "October 2008, which was the earliest time at which it understood that it had not provided approvals for five unit sales." FF 45. When it learned about the disputed sales, Liberty immediately[13] informed First American of the discrepancy. FF 50-51. Because this was over a year after the UOs closed on their homes, the UOs could not have relied on Liberty's alleged silence. That silence cannot form the basis of their equitable estoppel claim. Accordingly, the UOs have failed to establish the second estoppel element. See Sorenson, 158 Wash.2d at 541, 146 P.3d 1172 (finding no estoppel where the record did not *844 support a "nexus" between the alleged inequitable conduct and the harm).
¶ 25 To establish the injury element, the UOs argue that "the Unit Owners will lose title to their property." Br. of Appellant at 47. Liberty counters that this argument is in violation of a trial court in limine ruling and that absent the prohibited "lose their home" argument, the UOs cannot establish injury.[14] We need not address the alleged in limine violation because the UOs abandoned the argument below that they would lose title to their homes.[15] The argument is therefore not properly before us. RAP 2.5(a). And they point to nothing in our record to establish this assertion on appeal. See Cowiche Canyon, 118 Wash.2d at 809, 828 P.2d 549 (argument unsupported by citation to the record or authority will not be considered); RAP 10.3(a)(6). Accordingly, the UOs do not establish injury. Because the UOs fail to demonstrate the essential elements of equitable estoppel, this claim fails.

II. Unjust Enrichment

¶ 26 The UOs next argue that "Liberty Capital's Retention of Both the Right to Foreclose on the Unit Owners' Units and the $1.2 Million Dollar Benefit from the Unit Owners' Pay Down of Frontier's Debt Results in Unjust Enrichment...." Br. of Appellant at 48 (section heading). Liberty counters that the UOs cannot satisfy the elements of their unjust enrichment claim.
¶ 27 "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wash.2d 477, 484, 191 P.3d 1258 (2008). A claim of unjust enrichment requires proof of three elements"(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." Young, 164 Wash.2d at 484-85, 191 P.3d 1258. All three elements must be established for unjust enrichment. See Young, 164 Wash.2d at 484, 191 P.3d 1258.
¶ 28 A person is unjustly enriched when he or she profits or enriches himself or herself at the expense of another contrary to equity. Farwest Steel Corp. v. Mainline Metal Works, Inc., 48 Wash.App. 719, 731-32, 741 P.2d 58 (1987). "Enrichment alone will not suffice to invoke the remedial powers of a court of equity. It is critical that the enrichment be unjust both under the circumstances and as between the two parties to the transaction." Farwest Steel, 48 Wash.App. at 732, 741 P.2d 58. The mere fact that a defendant has received a benefit from the plaintiff is insufficient alone to justify recovery. The doctrine of unjust *845 enrichment applies only if the circumstances of the benefits received or retained make it unjust for the defendant to keep the benefit without paying. Chandler v. Wash. Toll Bridge Auth., 17 Wash.2d 591, 601, 137 P.2d 97 (1943).
¶ 29 The UOs fail to show why it is unjust for their title insurer, First American Title Insurance Company, to pay $1.3 million when the duty to defend the UOs under the First American title policy was triggered by a First American escrow officer's error or omission. See unchallenged FF at 53 ("[T]he Court finds by a preponderance of the evidence that First American closed the five disputed closings without receiving any prior approval from Liberty Capital."). The UOs specifically argue,
In addition, denying the Unit Owners a decree quieting title, while allowing Liberty to go ahead with foreclosing on the Unit Owners' property, will unjustly enrich Liberty. Liberty will get to keep the over $1,200,000 benefit represented by the contribution of the Unit Owners' real purchase monies to the paydown of Frontier's senior lien, while also receiving either title to the Unit Owners' units ormore likelyover $1,300,000 cash on the barrelhead when First American (as the Unit Owners' title insurer) "successfully" bids its purchase price policy limits at the foreclosure sale.[[16]]
Reply Br. of Appellant at 13-14 (emphasis added). There is nothing unjust about enforcing a valid deed of trust with clear priority where due diligence by First American could have cleared title. And the UOs cite no case authority finding unjust enrichment under similar facts. We conclude the UOs fail to show an unjust benefit to Liberty under these circumstances.
¶ 30 Furthermore, the UOs cannot establish that any alleged enrichment was unjust given that Liberty had no knowledge of the UOs' closings. In Irwin Concrete, Inc. v. Sun Coast Props., Inc., 33 Wash.App. 190, 194, 653 P.2d 1331 (1982), subcontractors worked on a water system that increased the value of the owner's land and enabled the owner to pay off its construction loan. The owner did not pay the contractors, and they filed liens on the property. Irwin Concrete, 33 Wash.App. at 192-93, 653 P.2d 1331. The court held that "it would be unjust for [the owner] to receive the benefit of the [contractor's] work without paying" where the owner knew about the work, urged and consented to completion, and "silently acquiesced in the work when it was foreclosing its deed of trust." Irwin Concrete, 33 Wash.App. at 194-95, 653 P.2d 1331.
¶ 31 In Seattle Mortgage Co. v. Unknown Heirs of Gray, 133 Wash.App. 479, 499, 136 P.3d 776 (2006), Seattle Mortgage loaned Daisy Gray $135,000 in exchange for a promissory note and a deed of trust against her residence. Subsequently, Tacoma Public Utilities Department (Tacoma PUD) loaned Gray $3,186.96 for energy conservation improvements to her home, which it secured with a lien against Gray's home. When Gray died and payments on the Seattle Mortgage debt ceased, Seattle Mortgage filed a complaint for foreclosure, naming Tacoma PUD as a defendant. At summary judgment, the trial court ruled that Seattle Mortgage's deed of trust took priority and foreclosure would extinguish Tacoma PUD's interest. On appeal, Tacoma PUD argued that granting summary judgment would unjustly enrich Seattle Mortgage because it would receive the benefit of the home improvements without paying for them. The court held,
Seattle Mortgage was unaware of the loan. Thus, unlike the defendant in Irwin Properties, Seattle Mortgage did not "silently acquiesce[ ]" to the improvements and then *846 seek to benefit from them without paying. 33 Wash.App. at 194, 653 P.2d 1331.
The trial court did not err in refusing Tacoma PUD's unjust enrichment claim.
Seattle Mortgage, 133 Wash.App. at 499, 136 P.3d 776.
¶ 32 Here, Liberty had no knowledge that the UOs were purchasing their units and did nothing to encourage the process. Thus, unlike the defendants in Irwin and like those in Seattle Mortgage, Liberty did not "silently acquiesce[ ]" to the closing and then seek to benefit from them without paying. Irwin Concrete, 33 Wash.App. at 194, 653 P.2d 1331; Seattle Mortgage, 133 Wash.App. at 499, 136 P.3d 776. The UOs fail to establish that their payment to Frontier, made without Liberty's knowledge and in derogation of the agreed approval procedure, constitutes an unjust benefit. See Seattle Mortgage, 133 Wash.App. at 499, 136 P.3d 776.
¶ 33 The UOs incorrectly argue that Liberty's retention of the funds would be unjust because "Liberty Capital ignored actual notice of the Unit Owners' sales for fifteen months while acknowledging the actual benefit in the loan reduction to Frontier...." Br. of Appellant at 49. That assertion is contradicted by the trial court's unchallenged FF 45 that Liberty did not learn about the unapproved closings until "October 2008, which was the earliest time at which it understood that it had not provided approvals for five unit sales." The UOs also contend that "[Liberty's] fail[ure] to police its own requirements for reviewing each sales transaction" makes its retention of the alleged benefit unjust. Br. of Appellant at 49. But Liberty was entitled to rely on its agreement with First American to close Starpoint sales through a written approval process. And nothing in the record shows First American's unilateral decision to deviate from that agreed procedure should be attributed to Liberty. The UOs have failed to establish unjust enrichment.[17]

III. Equitable Subrogation

¶ 34 Even though we conclude that the UOs have failed to demonstrate an unjust benefit, we nevertheless address their alternative equitable subrogation contention. The UOs argue that the trial court erred by not applying the doctrine of equitable subrogation to elevate the UOs to Frontier's first priority position. Liberty counters that the doctrine is inapplicable because the UOs did not fully discharge Frontier's debt and because its application would materially prejudice Liberty.
¶ 35 "Equitable subrogation provides an exception to the first in time rule by permitting a person who pays off an encumbrance to assume the same lien priority position as the holder of the previous encumbrance." Bank of America, NA v. Wells Fargo Bank, NA, 126 Wash.App. 710, 714, 109 P.3d 863 (2005), rev'd on other grounds, Bank of Am., N.A. v. Prestance Corp., 160 Wash.2d 560, 160 P.3d 17 (2007).
For example, suppose A, a homeowner, has two mortgages: one recorded first by bank B and one recorded second by bank C. Our recording act says B has a higher priority because it recorded first, putting the world on notice as to its interest in A's land. RCW 65.08.070. "If D fully discharges B's debt, then equitable subrogation substitutes D for B, so D has a higher priority than C, even though D recorded after.
Prestance, 160 Wash.2d at 564-65, 160 P.3d 17. "As an equitable remedy, subrogation is designed to avoid one person receiving an unearned windfall, i.e., the intervening lienholder through an advancement in priority, at the expense of another, i.e., the new mortgagee who paid the prior debt." Bank of America, 126 Wash.App. at 714, 109 P.3d 863. In Prestance, our Supreme Court adopted the definition of equitable subrogation from Restatement (Third) of Property: *847 Mortgages § 7.6 (1997). That section provides,
(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.[[18]]
¶ 36 Relying on Prestance, the UOs argue that because "[t]he Unit Owners and their lenders paid in full the portion of senior lienor Frontier's loan allocated to the Unit Owners' units," they should be equitably subrogated to Frontier's first priority position. Reply Br. of Appellant at 19. In Prestance, Sakae Sugihara obtained a home loan from Washington Mutual secured by a deed of trust on the property. Sugihara then "took out a series of business and home equity loans [from Bank of America], each time pledging the residence as at least a portion of the security." Prestance, 160 Wash.2d at 562, 160 P.3d 17. Finally, Sugihara obtained a home equity line of credit from Wells Fargo Bank (WFB) West partly for the purpose of paying off the Washington Mutual mortgage. WFB West paid off the Washington Mutual mortgage and gave the balance to Sugihara. Bank of America, 126 Wash.App. at 713, 109 P.3d 863. Adopting the restatement definition of equitable subrogation and its provisions on knowledge of the intervening loan, the Supreme Court concluded that because Bank of America suffered no material prejudice, "WFB West [was] equitably subrogated to Washington Mutual's first-priority lien...." Prestance, 160 Wash.2d at 582, 160 P.3d 17.
¶ 37 But in Prestance, the question before the court dealt with the lender's actual or constructive knowledge in the context of a conventional refinancing. "The only issue before us is a legal one: should we adopt 7.6 of Restatement (Third) to hold a refinancing mortgagee's actual or constructive knowledge of intervening liens does not automatically preclude a court from applying equitable subrogation." Prestance, 160 Wash.2d at 564, 160 P.3d 17. The court held, "We now reverse the Court of Appeals and adopt 7.6 of the Restatement (Third). We hold a lender can be equitably subrogated to a first-priority lien despite having actual or constructive knowledge of junior lienholders." Prestance, 160 Wash.2d at 562, 160 P.3d 17. The narrow holding of Prestance is about knowledge. Because the parties here do not argue knowledge, Prestance does not control.
¶ 38 In addition, unlike in Prestance where the junior lienor suffered no material prejudice, we conclude the record amply demonstrates material prejudice to Liberty's rights if the UOs are equitably subrogated to Frontier's first priority position. "Equitable subrogation should never be allowed if a junior interest is materially prejudiced...." Prestance, 160 Wash.2d at 572, 160 P.3d 17. In Prestance, the second position creditor, Bank of America, was not prejudiced because it maintained its second priority position and was thus in no worse position than it would have been [in] had [the refinance lender] never made its ... loan. Prestance, 160 Wash.2d at 581, 160 P.3d 17 (quoting the trial court's ruling). But Bank of America was a prior home equity lender with no role in Sugihara's decision to refinance his primary mortgage. By contrast, Liberty had carefully negotiated an agreement with First American to be consulted on every closing and to close only with its written approval. As a *848 result of First American's failure to follow that agreed process, Liberty suffered material prejudice in several ways.
¶ 39 First, because Liberty was unaware that the five units were sold, it could not accurately assess its loan security in the context of a precipitously falling real estate market. Consequently, Libertyunder the mistaken belief that its loan was secured by 15 unsold units (instead of the actual 10)was precluded from demanding additional collateral from GMP to secure its loan. According to challenged FF 39,
Liberty Capital presented unrebutted evidence that had it received earlier notice of the higher number of units being sold (and the consequent reduction in its loan collateral), it could have gone to the borrower (GMP) and demanded additional collateral. David Dammarell testified without contradiction that GMP had additional collateral available as late as January 2008 (a gas station property in Kirkland).
The UOs' opening brief provides no argument or analysis for why this challenged finding is not supported by substantial evidence and cites to nothing in the record that casts doubt on this critical finding. The UOs' challenge to this finding is thus waived. See Cowiche Canyon, 118 Wash.2d at 809, 828 P.2d 549 (plaintiffs who assigned error to finding of fact but presented "no argument in their opening brief on any claimed assignment" waived that assignment of error.); RAP 10.3(a)(4). And while the UOs address FF 39 in a footnote in their reply brief, "[a]n issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon, 118 Wash.2d at 809, 828 P.2d 549. Furthermore, "placing an argument of this nature in a footnote is, `at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal.'" St. Joseph Gen. Hosp. v. Dep't of Revenue, 158 Wash.App. 450, 473, 242 P.3d 897 (2010) (quoting State v. Johnson, 69 Wash.App. 189, 194 n. 4, 847 P.2d 960 (1993)).
¶ 40 Nevertheless, our review of the record indicates that FF 39 is supported by substantial evidence. When the trial court has weighed the evidence, we review the trial court's factual findings for substantial evidence to support them. We then determine whether the findings of fact support the conclusions of law and judgment. Brin v. Stutzman, 89 Wash.App. 809, 824, 951 P.2d 291 (1998). "`Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" Brin, 89 Wash.App. at 824, 951 P.2d 291 (quoting Cowiche Canyon, 118 Wash.2d at 819, 828 P.2d 549). There is a presumption in favor of the trial court's findings, and the party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence. Fisher Props., Inc. v. Arden-Mayfair, Inc., 115 Wash.2d 364, 369, 798 P.2d 799 (1990). We defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses. Boeing Co. v. Heidy, 147 Wash.2d 78, 87, 51 P.3d 793 (2002).
¶ 41 Dammarell's testimony provides substantial evidence to support FF 39:
[LIBERTY'S COUNSEL]: If you began to conclude at some point that the collateral was losing value, that it was insufficient, what would be the procedure that you could follow to go back to the borrower and try to take some action based on that, if he is in default?
[DAMMARELL]: Well, based on my experience and the different borrowers we worked with, you could ask for a balloon payment, if they have cash sitting around, you could foreclose on the property, you could ask for additional collateral and security.
Q: Now, did any of the Liberty Capital entities have other loans during this same time period to companies owned or operated by Greg Prendergast?
A. Yes, we did.
Q: And in any of those other loans did you have occasion to go back to Mr. Prendergast and demand additional collateral based on some kind of default that was occurring in his performance?
A. Yes, we did.
Q: And when was the last point in time when you can recall that occurring?

*849 A: The last time it did occur was in January of 2008.
Q: And what kind of additional collateral was Mr. Prendergast able to provide in that time frame?
A. He gave us a lien or deeded trust position on a gas station, a Chevron gas station that he owned at the time in downtown Kirkland.
Q: So if you had realized prior to January 2008 that five or more units had been closed by First American without going through that process you have described, do you believe you would have had the option to go after that gas station collateral or some other collateral that Mr. Prendergast apparently had at that time?
A: Well, I don't know because I didn't ask at the time, but he did have additional collateral, and after that date, when we requested it, additional collateral for other loans to be released, he gave it to us.
RP (Jan. 14, 2010) at 41-43.
¶ 42 This testimony establishes that (1) GMP and Prendergast possessed additional collateral, (2) Liberty demanded it as additional security for other loans after the disputed closings, and (3) Prendergast made such collateral available to Liberty. The UOs fail to establish that FF 39 is not supported by substantial evidence or to provide a compelling reason why the presumption in favor of the trial court's findings and the deference afforded its decisions on the weight of evidence and credibility of witnesses should be overturned. Fisher Props., 115 Wash.2d at 369, 798 P.2d 799; Heidy, 147 Wash.2d at 87, 51 P.3d 793. The UOs' only argument on FF 39 is that
although Liberty claims (and the trial court duly found) that Liberty could have gone to GMP in January 2008 and demanded additional collateral (specifically, a gas station property in Kirkland), Liberty's argument and the finding upon which it relies ignores thatas shownLiberty was on notice of the closing of the sale of the five units at issue here by November 2007, and Liberty responded by reporting the good news to its investors the very next month!
Appellant's Reply Br. at 13. As we concluded above, this contention is contradicted by unchallenged FF 45, which establishes that Liberty did not learn about the unapproved closings until "October 2008, which was the earliest time at which it understood that it had not provided approvals for five unit sales." FF 45. Because the UOs have waived any challenge to FF 39 and substantial evidence supports FF 39, we conclude the UOs would suffer material prejudice.
¶ 43 In addition, Liberty would also suffer material prejudice because it was prevented from requesting changes to several questionable disbursements made as part of the disputed unit closings. See Section I, supra. Liberty was not a secondary home equity lender with no role in the third loan, as in Prestance, but a construction lender with secured rights that it negotiated to protect through an agreement to approve every sale. We conclude that under the circumstances here, application of equitable subrogation in the UOs' favor would result in material prejudice to Liberty.
¶ 44 Finally, we note "in the real estate context, equitable subrogation has been traditionally invoked only to prevent unjust enrichment; equitable remedies are not granted where it would produce injustice." Kim v. Lee, 145 Wash.2d 79, 89, 31 P.3d 665 (2001); see also RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES 7.6 cmt. (f) at 522. As discussed above, the UOs fail to establish that Liberty was unjustly enriched. See Section II, supra. Accordingly, the trial court did not err in refusing to equitably subrogate the UOs to Frontier's first priority position.[19]

*850 CONCLUSION

¶ 45 Because the UOs fail to establish that they are entitled to relief under principles of unjust enrichment, equitable estoppel, and equitable subrogation, we affirm the trial court rulings.[20]
WE CONCUR: SCHINDLER, and BECKER, JJ.
NOTES
[*] After oral argument, we granted First American's motion to substitute as the real party in interest because First American had settled the unit owners' claims.
[1] According to unchallenged finding of fact (FF) 13, "[t]he financing to GMP came from both Liberty Capital Starpoint Equity Fund LLC and Liberty Capital Bridge LLC. In October 2008, by way of two assignment documents (exhibits 235 and 236), Liberty Capital Bridge LLC became sole owner of the amended deed of trust against the Starpoint properties." We refer to both entities as "Liberty."
[2] "It was undisputed that GMP defaulted under its 2006 Loan Agreement. GMP failed to repay its loan by July 2007. . . . GMP therefore failed to meet key conditions under which Liberty Capital initially agreed to reconvey its deed of trust against the first 75 units sold." FF 19.
[3] The UOs challenge FF 22 solely on the grounds it may imply First American is escrow agent only for the UOs.
[4] Escrow Officer Warthan stated in a declaration that from July 30, 2007 to October 31, 2007, "I worked in First American's escrow department closing real estate transactions. . . . Another First American employee . . . and I were primarily responsible for closing the sales of Starpoint Condominium units." Ex. 244 at 2. There is no dispute that First American Title Insurance Company acted as escrow agent and title insurer for these disputed sales.
[5] "In 2008, during the last six months of Starpoint unit sales, First American began requesting formal signed requests for partial reconveyance from Liberty Capital as a precondition for each unit closing." FF 35.
[6] Units N-205, N-209, N-213, N-402, S-412. Clerk's Papers (CP) at 1862, 1838.
[7] An August 30, 2007, GMP's request for additional credit provided "Liberty Capital information from which it might have discovered that four units had been closed without its consent, [but] the evidence indicates that Liberty Capital did not realize the discrepancy in that time frame." FF 45.
[8] Norcon named as party defendants GMP, Liberty, Frontier, the Starpoint UOs, and others.
[9] But because we resolve the equitable grounds for relief by relying solely on unchallenged findings or unchallenged portions of challenged findings (with the exception of FF 39, which we discuss at length, infra), we decline to address the UOs' arguments.
[10] Prendergast and his wife owned GMP Homes, Inc. (the sole member of GMP VG Homes, LLC), the developer of the Starpoint project. RP (Jan. 25, 2010) at 101.
[11] The UOs' argument asserting silence as a basis for equitable estoppel does contain citation to the record and authority.
[12] The court found "a preponderance of the evidence that First American closed the five disputed closings without receiving any prior approval from Liberty Capital." FF 53
[13] Liberty informed First American "that First American's list `didn't match' Liberty Capital's list of the units on which [the] company `signed off'" on October 10, 2008the day after First American provided a full list of closed units to Liberty. FF 50-51.
[14] The UOs advance a similar argument as part of their unjust enrichment claim, stating, "The Unit Owners stand to lose title they reasonably believed was theirs free and clear at the time they purchased their units, and their lenders have lost the first-priority position they reasonably believed they had when they financed Unit Owners' purchases." Br. of Appellant at 49.

Before trial, the UOs moved in limine to exclude evidence that they had title insurance with First American Title Insurance Company in response to Liberty's proffered exhibits 246 and 247. Exhibit 246 is a June 30, 2009 letter from First American's counsel to Liberty's counsel advising that as to "Liberty Capital's nonjudicial foreclosure, First American considers the foreclosure to be a title insured claim and is defending the Applicants on Liberty Capital's foreclosure." Exhibit 247 is a June 16 e-mail sent by First American's attorney on the eve of the foreclosure sale requesting Liberty's loan balance so that First American could prepare to bid that amount at the foreclosure sale. The trial court's ruling precluded Liberty from presenting such evidence unless "an issue is raised as to Applicants' losing their homes." CP at 1810. The trial court later admitted exhibit 246 for the limited purpose of showing bias by First American's witnesses. At trial, First American made a tactical decision to abandon its contention about the UOs "losing their homes" after the trial court explained, "if they [UOs] open that door you [Liberty] get to rebut it." RP (Jan. 11, 2010) at 68. The record shows that the UOs introduced no evidence or argument on this point after the trial court's admonition.
And given our discussion in this case, we do not address Liberty's argument here that the door is now opened to admission of exhibits 246 and 247 because the UOs' appellate briefs argue the UOs "stand to" and "will lose title to their property" absent reversal.
[15] We likewise decline to address Liberty's motion to supplement the record on appeal with trial exhibits 246 and 247.
[16] While impermissibly arguing the UOs will lose their homes, the UOs acknowledge that First American Title Insurance Company is defending the UOs on Liberty's foreclosure and "more likely" would bid the "purchase price policy limits at the foreclosure sale." And unchallenged FF 7 states,

First American Title Insurance Company was hired as escrow closing agent for all 88 units sold in the Starpoint condominium. Its affiliate Northwest Post Closing Center assisted in processing paperwork for reconveyances of lender deeds of trust. As reflected in Ex. 246, First American has accepted tender of the Applicants' defense without a reservation of rights and posted the required bonds (Ex. 245) as security for damages arising from issuance of the Court's pre-trial injunction.
[17] The UOs also argue that they are entitled to a constructive trust for the value of the alleged unjust enrichment. But the UOs acknowledge that they failed to raise this argument below and it is therefore not properly before us. RAP 2.5(a); see Reply Br. of Appellant at 27 ("the precise remedial device of a constructive trust was not raised below"). Furthermore, because we conclude that there was no unjust enrichment, the UOs are not entitled to the constructive trust remedy.
[18] Restatement of Property, section 7.6 also provides several illustrations.

"(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:
"(1) in order to protect his or her interest;
"(2) under a legal duty to do so;
"(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or
"(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate."
[19] The UOs, in their third statement of additional authority, cite to a number of cases from other jurisdictions regarding the application of equitable subrogation in the purchase money context. But having concluded that equitable subrogation is inapplicable because Liberty would suffer material prejudice, we need not address this additional authority. Accordingly, we decline to address Liberty's motion to strike the UOs' third statement of additional authority. And given our resolution here, we do not address Liberty's partial payment argument.
[20] The UOs' supplemental authority does not alter this conclusion.