# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 50572-0-II |
| G.T. | UNPUBLISHED OPINION |

MAXA, C.J. – GT appeals a trial court order involuntarily committing him to Western State Hospital for up to 90 days for mental health treatment. Under RCW 71.05.280(4),[1] a person can be involuntarily committed for further treatment if the person is "gravely disabled."

We hold that substantial evidence supported the trial court's findings that (1) GT was gravely disabled as defined in former RCW 71.05.020(17)(b) (2016)[2], and (2) no less restrictive alternatives to commitment were available that were in GT's best interests. However, we hold that the trial court's commitment order contains scrivener's errors that improperly state the basis for GT's commitment and must be corrected. Accordingly, we affirm the trial court's commitment order but remand for the trial court to correct the scrivener's errors in the order.

## FACTS

In March 2017, GT was charged with third degree assault in Whatcom County. The superior court dismissed the criminal charge without prejudice after finding GT incompetent and ordered that he be committed to Western State Hospital for evaluation.

---

[1] RCW 71.05.280 was amended in 2018. LAWS OF 2018, ch. 291, § 15. Because those amendments do not affect our analysis, we cite to the current statute.

[2] This section now has been renumbered as RCW 71.05.020(22), although the language relevant to this appeal remains the same.

Two mental health professionals sought GT's involuntary commitment for 180 days under RCW 71.05.280. The petition alleged that GT was "gravely disabled," presented "a substantial likelihood of repeating" acts similar to the March assault, and was "not ready for a less restrictive placement" than treatment at the hospital. Clerk's Papers (CP) at 11-12.

In support of the petition, psychologist Johnathan Sharrette and physician Leslie Sziebert reported that during GT's hospitalization, he "demonstrated labile, grandiose behavior, inappropriate laughter, and hyperverbal language. He demanded that the physician prescribe methamphetamine." CP at 15. GT showed "active signs of a mood disorder . . . [and] pressured, rambling, tangential speech. His thoughts are disjointed and disorganized, making his reasoning difficult to follow. [GT] also exhibited grandiosity and possible paranoia as well." CP at 19. The petitioners diagnosed GT with bipolar I disorder and substance use disorder.

A hearing on the petition occurred in June 2017. The State clarified that it was now seeking involuntary treatment only for a period of up to 90 days for "grave disability" under RCW 71.05.280(4), and that it was abandoning its request for treatment for a period of up to 180 days based on dismissal of a felony charge under RCW 71.05.280(3).

Dr. Sharrette testified that GT suffered from bipolar disorder. He stated that GT's plans for leaving the hospital varied tremendously and largely were incoherent. GT did not believe he had a mental illness and likely would not take prescribed medications outside the hospital, causing his symptoms to persist or worsen. GT also had demonstrated aggression toward others who he blamed for his problems. Dr. Sharrette was concerned that "an amphetamine-like substance" such as the drugs GT appeared to be seeking could "cause a breakout of more mania." Report of Proceedings (RP) at 14. Dr. Sharrette believed that further hospitalization

and psychotropic medication would stabilize GT, lessen his manic symptoms and paranoia, and keep him from acting out aggressively towards others or pursuing amphetamines or opiods.

GT testified that if permitted to leave the hospital, he would return to Bellingham and stay in the mobile home he had there, living on social security income in addition to earnings from work as an electrician. GT also expressed that "I got to . . . get back on my meds. All these doctors keep cutting me off because of this opioid scare." RP at 21.

GT disagreed with Dr. Sharrette's bipolar diagnosis and countered "I have a good sharp mind, and he has judged me wrong. And what I need, and which [the hospital] couldn't give me here, is something that I really needed for pain." RP at 23. GT said the hospital was "giving me Tylenol, when on the outside I'm getting . . . super-strong opioids, . . . synthetic heroin, basically. And when they cut you off that stuff, you have to go look somewhere else." RP at 23.

The trial court entered an order for involuntary inpatient treatment. The court found that GT was gravely disabled and that a less restrictive alternative treatment was not in the best interests of GT or others. The trial court also denied GT's motion for reconsideration. GT appeals the 90 day commitment order.

## ANALYSIS

A.      INVOLUNTARY COMMITMENT

GT argues that substantial evidence does not support the trial court's factual findings that (1) he was gravely disabled and (2) no less restrictive alternative to commitment would be in his best interests. We disagree.

1.    Legal Principles

The State sought GT's involuntary treatment for 90 days under RCW 71.05.280(4), which provides that at the expiration of a 14-day period of intensive treatment a person may be confined for further treatment pursuant to RCW 71.05.320[3] if that person is "gravely disabled."

Former RCW 71.05.020(17)(b) states that a person is gravely disabled if, because of a mental disorder, he or she "[1] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and [2] is not receiving such care as is essential for his or her health or safety." This definition has two separate requirements: a severe deterioration in routine functioning and not receiving essential care. *In re LaBelle*, 107 Wn.2d 196, 205, 728 P.2d 138 (1986).

Former RCW 71.05.020(17)(b) is designed permit the State to "treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.' " *Id.* at 206 (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395, 410 (1985)). However, people cannot be involuntarily committed "solely because they are suffering from mental illness and may benefit from treatment." *LaBelle*, 107 Wn.2d at 207.

Regarding the first requirement of former RCW 71.05.020(17)(b), the State must provide recent proof of "significant" loss of cognitive or volitional control. *LaBelle* at 208. Regarding subsection (b)'s second requirement,

---

[3] RCW 71.05.320 was amended in 2018, but we will not use "former" in relation to this statute because the amendment was minor and does not affect any substantive provisions.

the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id.* The person must be "unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

The State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992). This standard means that it must be highly probable that the person is gravely disabled. *LaBelle*, 107 Wn.2d at 209. On appeal, we "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id.*

2.  Finding that GT was Gravely Disabled

GT argues that the State failed to prove both that his behavior demonstrated "repeated and escalating loss of cognitive or volitional control" and that such behavior would prevent him from receiving "such care as is essential for his . . . health or safety." Former RCW 71.05.020(17)(b). We disagree.[4]

a.  Loss of Cognitive or Volitional Control

GT argues that because this hospitalization was his first mental health contact since 2005, the State failed to provide sufficient evidence to find *repeated and escalating* loss of cognitive or

---

[4] GT initially asserts that the issues in his appeal are not moot even though the term of his commitment has passed. The State acknowledges that GT's appeal of the involuntary commitment order based on the gravely disabled standard is not moot because an involuntary commitment order may have adverse consequences on future involuntary commitment determinations. *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012).

volitional control. He argues that the situation that lead to his most recent commitment was not "repeated" but a single, continuous situation.

*LaBelle* does not expressly hold that repeated hospitalizations are necessary for a finding of "repeated and escalating loss of cognitive or volitional control" as GT contends. Instead, the State must provide "a factual basis for concluding that an individual 'manifests severe [mental] deterioration in routine functioning,' " including "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208 (alternation in original).

Here, the State presented substantial evidence of GT's severe deterioration in routine functioning, demonstrated by repeated and escalating loss of volitional and cognitive control, during his stay for evaluation in the hospital. GT exhibited intrusiveness, aggression, grandiosity, paranoia, "pressured, rambling, tangential speech," "impaired reasoning skills," lability, and an "inability to remain on topic for more than a few minutes at a time." CP at 16-19. He demanded a prescription for methamphetamine. He had to be removed from group therapy – where he was tangential, antagonistic towards others, and used inappropriate and derogatory language – because of his inability to control his behavior.

When evaluated by Dr. Sharrette, GT was unable to remain on topic for more than a few minutes at one time, or to remain seated without getting up to walk around the room. Concluding that GT showed "active signs of a mood disorder," Dr. Sharrette reasoned that "[a]s he has reportedly been incarcerated for several months at this point, [GT's symptoms] are not likely to be the direct results of substance intoxication or withdrawal." CP at 19.

GT also was unable to formulate a coherent or consistent plan for how he would live if released from the hospital, proposing at various times to go to live in Patagonia or alternatively in Canada. Although uncertainty of living arrangements by itself does not justify continued

commitment, where the individual's unsettled plans "are not the result of a choice of lifestyle but rather a result of his deteriorated condition," the court may properly consider this evidence to support a finding of "gravely disabled." *LaBelle*, 107 Wn.2d at 210. Here, the State presented evidence that GT apparently was unable to formulate a lucid, reasonable, or fixed plan for how or where he would live if released because his untreated symptoms of bipolar disorder prevented him from doing so.

GT testified at the hearing that if released he would live in his mobile home on property he owns in Bellingham, supporting himself with social security income, earnings as an electrician, and eventually work as a commercial fisherman. But an individual's ability to meet his or her basic needs does not necessarily mean that the individual can function safely or independently in the community. *See LaBelle*, 107 Wn.2d at 213. Even if GT were able to provide for his basic needs, without treatment or medication for bipolar disorder, the evidence suggests that his condition would devolve such that he would again exhibit the symptoms that resulted in his commitment.

> b.   Care Essential for Health or Safety

GT provides no meaningful argument regarding the second requirement of former RCW 71. 05.020(17)(b). He merely states without discussion that, although there was no question that he needed mental health treatment, the State failed to prove that he was incapable of making a rational choice about his own need for treatment.

The State presented substantial evidence that GT would not receive essential care for his health and safety if released from the hospital. GT had been diagnosed with bipolar disorder and substance use disorder. Dr. Sharrette testified at the hearing that GT had "stated he doesn't have a mental illness and wouldn't take the medications once he leaves [the hospital]." RP at 12. Dr.

Sharrette was concerned about GT's pursuit of "other substances such as methamphetamine, which he asked for a prescription for while he was [hospitalized]." RP at 12. Dr. Sharrette believed that GT's single-minded pursuit of pain medications would "likely further impair his already impaired ability to make rational decisions regarding his care and safety," such as addressing a swollen leg that hospital staff observed while GT was under evaluation, which GT mistakenly believed was muscle growth. CP at 18, 20.

GT testified that he did not believe he had bipolar disorder or that he needed additional mental health treatment. Rather than seeking treatment or medication for mental illness if released, GT's plan was to acquire "super-strong opioids, you know, synthetic heroin, basically." RP at 23. He wished to do this despite the fact that several doctors in Bellingham had advised him they would no longer provide him with opioids because they were concerned he was abusing pain medication.

In *Labelle*, the Supreme Court held the appellant's inability to understand his need for treatment and the likelihood he would not, if released, take the medication necessary to stabilize his mental deterioration tended to show that hospital treatment was essential to his health and safety. 107 Wn.2d at 213. In *In re Detention of R.H.*, this court affirmed the trial court's finding of grave disability where the appellant was unable on his own to obtain medical treatment sufficient to stabilize his mental condition unless he was involuntarily hospitalized. 178 Wn. App. 941, 947, 316 P.3d 535 (2014).

Here, the evidence showed that GT had a lack of understanding about his need for psychotropic medication, telling hospital providers that he would not take this medication if released and claiming not to have a mental illness.

### c. Substantial Evidence

We hold that the State presented substantial evidence that the trial court reasonably could have found to be clear, cogent and convincing to support the trial court's finding under former RCW 71.05.020(17)(b) that GT was gravely disabled because he (1) demonstrated a "repeated and escalating loss of cognitive or volitional control" and (2) would not receive "care as is essential to his . . . health or safety" if released.

### 3. Less Restrictive Treatment

GT argues that the State did not make a showing that no less restrictive alternative to involuntary commitment would be in his best interests. We disagree.

RCW 71.05.320(1) provides that, if the trial court finds a person to be gravely disabled, it also must determine "that the best interests of the person or others will not be served by a less restrictive treatment which is an alternative to detention" before ordering involuntary commitment. The statute empowers the trial court "to determine the best interests of the individual and in so doing, to consider less restrictive treatment." *In re Det. of J.S.*, 124 Wn.2d 689, 699, 880 P.2d 976 (1994). The State has the burden of proving that a less restrictive alternative is not in the best interests of the person to be committed. *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 186, 97 P.3d 767 (2004).

However, although "RCW 71.05 guarantees that less restrictive treatment for involuntarily detained individuals will be *considered*, . . . it does not expressly grant them a [statutory] *right* to less restrictive treatment." *J.S.*, 124 Wn.2d at 701 (emphasis added). Further, a person is not entitled to treatment in a less restrictive setting when continued treatment is "amply supported by professional judgment." *Id.*

Here, the trial court found that less restrictive alternative treatment was not in GT's best interests. At the commitment hearing, Dr. Sharrette testified that GT could not be in a less restrictive environment than a hospital in favor of "something that's still supportive" because "[a]t this point in time, he still has active symptoms of mental illness including lack of organization, the mania, inability to control his actions and behavior . . . and inability to focus." RP at 13-14. GT had also demonstrated "symptoms of a little bit of paranoia, blaming others for his problems . . . [and] aggression, . . . stating that it's all a certain neighbor's fault and [he has] to get even with him or [has ] to hurt him." RP at 11.

When asked whether he believed these symptoms would resolve with further hospitalization and medication, Dr. Sharrette replied "[y]es. . . In the past, he had been stabilized, at least in 2005. . . I think it goes to reason that it could happen again (inaudible) same medication." RP at 14. Dr. Sharrette also hoped that further hospitalization would increase GT's "ability to hold a conversation . . . without becoming aggressive, without threatening other people." RP at 13.

Dr. Sharrette also expressed a concern that if GT left the controlled environment of the hospital, he would stop taking his psychotropic medications and instead seek out opioids and amphetamines, which would worsen his manic symptoms. GT confirmed this concern during his testimony at the hearing by stating, "[the hospital is] giving me Tylenol, when on the outside I'm getting . . . super-strong opioids, . . . synthetic heroin, basically. And when they cut you off that stuff, you have to go look somewhere else. And so it's not about . . . psych meds." RP at 23.

GT contends that the trial court did not adequately discuss less restrictive alternatives to commitment because outpatient and check-in release alternatives were not explicitly discussed at the commitment hearing. However, RCW 71.05.320(1) does not require that specific

alternatives to inpatient treatment be considered as part of the less restrictive treatment analysis, but leaves this consideration within the trial court's discretion. Moreover, given GT's explicit illegal-drug-seeking behavior, denial of his mental illness, and displays of aggression towards others, it is unlikely that the less restrictive alternatives he presents on appeal would have been in his best interests or those of others.

We hold that the State provided substantial evidence to support the trial court's finding that no less restrictive alternative to commitment would be in GT's best interests.

### 4. Summary

We hold that the State presented substantial evidence to support the trial court's findings that GT was gravely disabled and that no less restrictive alternative to commitment would be in GT's best interests. Accordingly, we affirm the trial court's involuntary commitment order.[5]

## B. SCRIVENER'S ERRORS

GT argues, and the State concedes, that the commitment order contains certain scrivener's errors stating a basis for GT's commitment under RCW 71.05.280(3), which must be corrected. We agree.

RCW 71.05.280(3) provides that a person may be committed for further treatment if that person "has been determined to be incompetent and [felony] criminal charges have been dismissed . . . and as a result of a mental disorder, presents a substantial likelihood of repeating similar acts." Here, the order of commitment contains a finding that GT "was determined to be incompetent and felony charges were dismissed," as well as the legal conclusion that GT "as a

---

[5] GT includes the trial court's denial of his motion for reconsideration under the "Assignments of Error" heading in his brief as well as under the "Questions Presented" heading. But he does not explain this claim or present any argument on it. Therefore, we decline to consider this argument. RAP 10.3(a)(6); *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011).

result of a mental disorder . . . presents/continues to present a substantial likelihood of repeating acts similar to the charged criminal behavior." CP at 24, 25-26.

Although the State initially pursued GT's commitment on this basis as well as on grave disability under RCW 71.05.280(4), the State subsequently dropped the request for commitment based on the dismissed felony charge and proceeded only under the gravely disabled standard. The State presented no evidence at the hearing of GT's dismissed felony charges and made no argument that GT should be committed because a mental disorder made it substantially likely he would repeat criminal acts.

Accordingly, we hold that the language of the commitment order suggesting a basis for GT's commitment under RCW 71.05.280(3) is a scrivener's error that must be corrected on remand.

## CONCLUSION

We affirm the civil commitment order, but we remand for the trial court to correct the scrivener's errors identified above.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, C.J.

We concur:

_____
LEE, J.

_____
MELNICK, J.