IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JUDITH ANDERSON, a single woman, | ) | No. 70814-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD ANDERSON and | ) | UNPUBLISHED OPINION |
| MARGARET ANDERSON, Husband | ) | |
| and Wife, | ) | |
| | ) | |
| Appellants. | ) | FILED: March 9, 2015 |

SCHINDLER, J. — A common grantor may establish a binding boundary line if the grantor sells the land with reference to such line and the grantor and original grantees agree to the identical tract of land to be transferred by the sale. Here, the prior owners of Tract 2, Richard and Margaret Anderson (Richard), claimed title to property along a disputed boundary line located between the southern boundary of Tract 2 and the northern boundary of the property owned by Charles and Judith (Judy) Anderson, Tract 4.[1] Following a four-day bench trial, the court ruled Richard did not prove that a swale and barbed wire horse fence established the boundary line between the two tracts under the common grantor doctrine. Richard contends the court erred in applying the

---

[1] Because the parties have the same last name, we refer to them by their first names for purposes of clarity.

common grantor doctrine and abused its discretion in denying his motion for reconsideration. We affirm the court in all respects.

FACTS

LeRoy Caverly owned 125 acres of forested, rural land in Snohomish County near Monroe. Caverly logged and built a house near the north boundary of what he later designated as Tract 1 and Tract 2.

In 1969, Caverly hired Voorheis-Trindle-Nelson Inc. (Voorheis) to conduct a survey of the 80 acres. Voorheis placed five concrete monuments along the outer boundary of the rectangular 80-acre parcel: a monument at the northeast corner of what Caverly later designated Tract 1, a monument at the northwest corner of what Caverly later designated Tract 2, a monument at the east end of the boundary between what Caverly later designated Tract 1 and Tract 3, a monument at the west end of the boundary between what Caverly later designated Tract 4 and Tract 6, and a monument at the southwest corner of what Caverly later designated Tract 8.

Charles and Judy Anderson were interested in purchasing rural property in Snohomish County. In 1975, Charles contacted Caverly. At first, Caverly told Charles he was not interested in selling "any portion of his land." But after deciding Charles and Judy "had a genuine interest in purchasing land," Caverly decided to sell property to them.

Caverly gave Charles and Judy a copy of the Voorheis survey and a rough sketch based on the Voorheis survey. The rough sketch depicts a rectangular 80-acre parcel of property divided equally into 12 square tracts with one irregularly shaped "entry parcel." The two northernmost square tracts are designated as Tract 1 and Tract

2

2. Tract 1 is located east of Tract 2. Tracts 3 and 4 are located south of Tracts 1 and 2. Tract 5 and Tract 6 are located south of Tract 3 and Tract 4.

Charles and Judy were interested in purchasing Tract 1 and Tract 2. But Caverly "did not want to sell those tracts at that time." Caverly agreed to sell Charles and Judy Tract 3 and Tract 4. On March 1, 1976, Caverly and Charles and Judy entered into a real estate contract to purchase Tract 3 and Tract 4. The statutory warranty deed describes the property as "[t]he South half of the Northwest quarter of the Southeast quarter of Section 22, Township 27 North, Range 6 East, W.M., together with and subject to an easement for ingress, egress and utilities."[2]

On March 22, Caverly recorded "Covenants and Agreements." Section I describes Caverly's intent to divide and sell his land:

> LeRoy F. Caverly, being the owner of a parcel of land (approximately 125 acres) having maintained ownership for over 25 years and having decided to divest himself of said property by selling tracts of raw, undeveloped land and at the same time desiring to maintain a semblance of esthetic country living, has offered to sell the land described in Section II.

Section II describes the division of the property into 13 tracts: "The three (3) one sixteenth's (1/16) of a section parcel shall be quartered making 12 tracts identified as Tracts 1 through 12 (see map Schedule A) and the entry parcel identified as 'Tract E.' " Attached is a copy of the rough sketch that Caverly gave Charles and Judy.

After selling Tracts 3 and 4 to Charles and Judy, Caverly began "extensively clearing [Tracts] 1 and 2 so that he could put the road in that would access all of the

---

[2] (Capitalization omitted.) The deed also describes a roadway easement and an easement for an equestrian and bridle trail. The description of the roadway easement states, in pertinent part, "Thence South along the North-South centerline of the West half of the Southeast quarter of Section 22." (Capitalization omitted.) The description of the equestrian and bridle trail easement states, in pertinent part, "[O]ver and across the South 15 feet of the Northeast quarter of the Northwest quarter of the Southeast quarter of Section 22." This deed was delivered upon fulfillment of the contract and recorded September 17, 2009.

lots." Charles and Judy gave Caverly permission to clear between Tract 2 and Tract 4 "wherever it made sense" based on the "contour of the land." After Caverly installed the access road, Charles and Judy began clearing Tract 3.

Charles and Caverly became good friends and worked together on projects. Charles helped Caverly build a cattle barn on Tract 2 and install livestock containment fences in several different locations. Caverly helped Charles install a culvert across a creek that runs north-south along the west end of Tract 2 and Tract 4. Caverly also helped Charles build a gravel path over the culvert near the northwest corner of Tract 4 in order to facilitate access to the west side of the property.

In July 1979, Caverly sold Tract 1 to John and Christine Campbell. The statutory warranty deed describes Tract 1, in pertinent part, as "[t]he Northeast quarter of Northwest quarter of Southeast quarter of Section 22, Township 27 North, Range 6 East, W.M."

After selling Tract 1 to the Campbells, Caverly created "for his own purposes" an annotated version of the Voorheis survey, the "Caverly Reference Copy." The Caverly Reference Copy contains handwritten notations that do not appear on the Voorheis survey. At some point, Caverly gave Charles and Judy a copy of the Caverly Reference Copy.[3]

In the 1980s, the Campbells used the concrete monument Voorheis placed at the southeast corner of Tract 1 to build a fence. By 1984, the Campbells had cleared Tract 1 and built a house on the property.

In the early 1980s, Cascade Surveying & Engineering Inc. (Cascade) conducted a survey of land located near the Caverly tracts. Cascade did not use the 1969

---

[3] The Caverly Reference Copy identifies Tract 1 as owned by the Campbells.

Voorheis survey concrete monuments. Instead, Cascade used the concrete monuments placed by the Washington State Department of Game[4] in 1974. In 1974, the Department of Game placed two concrete monuments "that had previously been placed in a different location by Voorheis." The discrepancy between the Cascade survey and the Voorheis survey created uncertainty about boundary lines "throughout the Caverly tracts."

In 1988, Charles and Judy's son installed a barbed wire fence on Tract 4 to contain their horses by stringing the wire along "T posts" and trees. The barbed wire fence "meandered along the north portion of Tract 4" and created a horse enclosure for approximately one-third of Tract 4.

In 1989, Caverly sold Tract 2 to Charles Vollstedt and Carol Boswell (Boswell). The statutory warranty deed describes Tract 2 as "[t]he Northwest quarter of the Northwest quarter of the Southeast quarter of Section 22, Township 27 North, Range 6 East, W.M.; Situate in the County of Snohomish, State of Washington."[5]

Caverly died in the early-to-mid-1990s.[6]

Between 1992 and 1994, Charles and Judy removed the barbed wire fence and cleared Tract 4. Charles and Judy hired a contractor to build a pond and to excavate an overgrown drainage ditch running along the northern portion of Tract 4 near Tract 2 (the "swale"). While excavating the swale, the contractor "encountered a large rock." To avoid the rock, the contractor "angl[ed] the ditch southward," resulting in a swale that curved south at the western end of Tract 4. To divert drainage from the swale and the

---

[4] Now known as the Washington State Department of Fish and Wildlife.

[5] Capitalization omitted.

[6] His spouse sold the property they owned north of Tract 1 and Tract 2 to Claude and Maureen DeShazo.

pond, the contractor also installed a second culvert approximately 15 feet south of the culvert Charles and Caverly installed near the northwest corner of Tract 4.

In 1994, Charles and Judy; the Campbells, the owner of Tract 1; Boswell, the owner of Tract 2; and Jim and Rhea Gately, the owner of Tract 5, hired Cascade to conduct a survey of their property. Consistent with its previous survey, Cascade used the concrete monuments placed by the Department of Game in 1974. Cascade completed the survey in October 1994.

On July 16, 1995, Charles and Judy sent a letter in an effort to "reach a common agreement with all the affected tract owners" to the Campbells, Boswell, and the Gatelys. Charles and Judy proposed accepting the boundary lines in the Cascade survey but entering into agreements to "leave all the fences as they are presently placed." The letter states, in pertinent part:

> If the Cascade survey is accepted by everyone my suggestion to the other owners is – we leave all the fences as they are presently placed with a written agreement between the owners of our concurrence with the survey and corresponding property lines. The fences can be handled on an individual basis as circumstances dictate.

In 1997, Boswell sold Tract 2 to Richard and Margaret Anderson (Richard). An addendum to the real estate contract discloses "a possible deviation of 20[ feet plus/minus] between lines of occupancy and the deed boundary lines as surveyed by Cascade." The addendum states that Charles and Judy "removed the common boundary fence" between Tract 2 and Tract 4. The addendum states, in pertinent part:

> Subject property was platted in the 1970's. A recent survey by Cascade Surveying and Engineering, Inc. discloses a possible deviation of 20[ feet plus/minus] between lines of occupancy and the deed boundary lines as surveyed by Cascade. The neighbor immediately south of subject premises ([Charles and Judy]) has removed the common boundary fence between Boswell and [Richard]. Seller shall execute her warranty deed

6

subject to questions of survey and boundary as disclosed by the Cascade survey.

In late 1997 or early 1998, the Campbells' attorney notified Charles and Judy that "based on the doctrines of adverse possession and boundary by acquiescence, the appropriate boundary lines are those reflected by the cement monuments, the Voorheis survey, and the fences." Charles and Judy agreed that the fences located between Tract 1 and Tract 3 had been in place for more than 10 years and that the fence established the boundary line between the two tracts. Charles and Judy and the Campbells entered into and recorded a "Survey/Property Line Acknowledgment Affidavit."[7]

After the Gatelys sold Tract 5 to Vern Cohrs, Charles and Judy sent a letter to Cohrs describing the "history of the development of the area." In the February 1998 letter, Charles and Judy agreed that "based on the doctrines of adverse possession and boundary by acquiescence," the existing fence established the boundary between Tract 3 and Tract 5. The letter states, in pertinent part:

> John and Chris[tine] Campbell consulted with an attorney, who informed us that regardless of a new survey, based on the doctrines of adverse possession and boundary by acquiescence, the appropriate boundary lines are those reflected by the cement monuments, the Voorheis survey, and the fences.
>
> [Charles and Judy] and the Campbells[ ] have agreed with this legal decision and will leave the fences where they are and have a surveyor revise the legal description for each tract accordingly.
>
> As you and I discussed[,] our mutual east-west property line between tracts 3 and 5 would be treated the same. The fence installed on this

---

[7] The Survey/Property Line Acknowledgment Affidavit states, in pertinent part:
We acknowledge and agree that the common property line of these two properties, which is the south property line and boundary of [Tract] 1 of High Meadow and the North property line and boundary of [Tract] 3 of High Meadow, is currently delineated by the existing location of the fence belonging to the owners of said [Tract] One.

property line per the original survey will remain and we will have a surveyor revise the legal description for each tract accordingly.

In 2001, Richard purchased two tracts of land located directly west of Tract 2 and Tract 4. Richard widened and extended the gravel path that Charles and Caverly had built over the original culvert in the northwest corner of Tract 4 to reach the tracts from the access road.

In 2003, Charles and Judy decided to install a fence on Tract 4 and hired a surveyor to place corner stakes on the boundary lines based on the Cascade survey. Richard wrote to Charles and Judy "ask[ing] them to stop a survey for a fence between Tracts 2 and 4." Richard claimed the "drainage ditch" established the boundary line between Tract 2 and Tract 4. The letter states, in pertinent part:

> The Alta insurance policy we purchased on the title to our land specifically designated the drainage ditch as the south property line for our parcel based on the survey of record at that time. Other factors also establish history for that line.

Charles Anderson died in July 2006.

In 2007, Judy filed a quiet title and trespass action against Richard. Judy alleged the Cascade survey located the boundary line between Tract 2 and Tract 4 and Richard trespassed on Tract 4 "by operating vehicles across it to gain access" to the other tracts he owns to the west of Tract 2 and Tract 4.

Richard filed an answer denying the Cascade survey located the boundary between Tract 2 and Tract 4. Richard asserted that Caverly sold his property "with reference to his Voorheis survey map and said Voorheis monuments" and the concrete monuments placed "at the corners of most Tracts." Richard alleged that Boswell purchased Tract 2 in reliance on the Voorheis survey as well as a "fence built, ditch dug

8

and culvert installed in reliance on said Voorheis monuments." Richard alleged the "fence was taken down unlawfully by [Judy]'s late husband, but Boswell and [Richard] continued to hold to the line and swale established as a result of said fence and ditch."

In August 2008, Richard sold Tract 2 to Darren and Barbara Massey (Massey) based on the Cascade survey but retained the right to litigate the boundary dispute with Judy. Richard also retained a 60-foot easement along the south boundary of Tract 2 to allow access to the two tracts he owns to the west. Massey and Judy entered into an agreement to establish the boundary line between Tract 2 and Tract 4 consistent with the Cascade survey. Richard refused to enter into a stipulation to dismiss the quiet title and trespass action.

Richard filed an amended answer asserting counterclaims under the common grantor doctrine and for adverse possession and mutual recognition and acquiescence. Richard claimed title to a strip of land between Tract 2 and Tract 4 with a curved boundary line measuring 620 feet long, east to west, 33.5 feet wide on the east end and 58.1 feet wide on the west end.

The common grantor doctrine counterclaim alleged, in pertinent part:

> Through a series of transactions, Common Grantor Caverly deeded many, if not all, of these 13 Tracts based upon legal descriptions which were assumed to match lines specifically identified on the ground when sold to original grantees by Voorheis concrete monuments with brass caps. . . . The original lines, and the improvements built within them, established lines clearly evidencing the meeting of minds as to the identical Tracts of land to be transferred from the Common Grantor to each of his grantees. Defendants' predecessor, Carol Boswell, purchased her Tract 2 from the Common Grantor in 1989. The Common Grantor had built a fence on the Voorheis survey line years before. The boundaries marked on the ground by the fence, and used by the Common Grantor, as well as Boswell, were immediately binding on Boswell. Likewise, said boundaries were

9

immediately binding, based upon their March 1976 REK [(real estate contract)], on Plaintiff and her late husband, as grantees.[8]

In the adverse possession counterclaim, Richard alleged an irregularly shaped, curved strip of land located between the two tracts had been "openly and notoriously, continuously and exclusively used, possessed and occupied" for more than 10 years. Richard asserted Caverly "constructed a fence, dug a ditch, put in a culvert and established a crossing along the Voorheis survey line."9

The mutual recognition and acquiescence counterclaim alleged that "a fence built, ditch dug and culvert crossing established in reliance on said Voorheis monuments over 30 years ago by the Common Grantor, LeRoy Caverly," established the boundary line between Tract 2 and Tract 4.10

Judy filed a summary judgment motion to dismiss the lawsuit. The court entered an order dismissing Judy's quiet title and trespass action. The court dismissed Richard's counterclaims for lack of standing. In the first appeal, we affirmed dismissal of Judy's claims against Richard but reversed dismissal of the counterclaims and

---

8 Emphasis in original.

9 The adverse possession counterclaim states, in pertinent part:

Said strip is approximately 33.5 feet wide, north to south, on the east, approximately 58.1 feet wide, north to south, on the west, and approximately 620 feet long, east to west. Said strip has been actually, openly and notoriously, continuously and exclusively used, possessed and occupied by Defendants . . . . Specifically, Plaintiff's predecessor in title, LeRoy Caverly, the Common Grantor, constructed a fence, dug a ditch, put in a culvert and established a crossing along the Voorheis survey line over 30 years ago. The fence (unlawfully removed by Plaintiff's late husband) and ditch created a demarcation which included a swale which continues to exist.

10 The counterclaim based on mutual recognition and acquiescence states, in pertinent part:

Defendants and Plaintiff, as well as their predecessors, have all used, possessed and developed their properties based upon Voorheis survey monuments, as well as a fence built, ditch dug and culvert crossing established in reliance on said Voorheis monuments over 30 years ago by the Common Grantor, LeRoy Caverly. This fence was used to locate a farm access road which divides the properties, until Plaintiff's late husband unlawfully removed the fence during Boswell's ownership.

remanded for trial. <u>Anderson v. Anderson</u>, 158 Wn. App. 1039, 2010 WL 4595972, at *3.[11]

On remand, the court scheduled a trial on Richard's counterclaims. In his trial memorandum, Richard asserts the common grantor doctrine "best fits the factual and legal issues in this case." The memorandum states that case law sets out "two elements involved in the Common Grantor Doctrine. . . . Was There An Agreed Boundary? [and] What Does A Visual Examination Establish?"[12]

A number of witnesses testified during the four-day bench trial, including Richard, his photograph expert Terry Curtis, Judy, and the contractor Charles and Judy hired to excavate the swale. The court admitted into evidence a number of exhibits, including the 1969 Voorheis survey, the rough sketch Caverly gave to Charles and Judy, the Caverly Reference Copy, the 1981 and 1994 Cascade surveys, statutory warranty deeds, boundary line agreements, and photographs.

Richard testified that when he purchased Tract 2, Boswell told him the barbed wire fence that Charles and Judy had removed marked the boundary between Tract 2 and Tract 4. Richard testified Boswell "very emphatically stated she was told by LeRoy Caverly when she bought the property that that south fence line defined the line — south line of that tract." Richard conceded "that the Voorheis survey map does not show [a] Voorheis monument at or near the southwest corner of [Tract] 2."[13]

---

[11] We held that Richard did not lose standing to assert the counterclaims when he sold Tract 2 to Massey because he "did not relinquish his claim of ownership of the disputed property between the Cascade survey's boundary line and the Voorheis survey's boundary." <u>Anderson</u>, 2010 WL 4595972, at *3.

[12] Boldface omitted.

[13] Likewise, his trial memorandum states that "there is no specific designation for placement of such a monument at the corner in question."

Richard's photograph expert Curtis examined a number of aerial photographs taken between 1969 and 2011 "to determine the visible limits of historical occupation and use of Tract 2." Curtis testified that based on all of the aerial photographs, "he perceived a persistent and consistent use/occupation line concurrent with the swale." The court admitted a report prepared by Curtis. The report states that two 1995 photographs show part of the swale was excavated "in alignment with the observed fenceline [sic] that runs along the southern boundary of Tract 1 to the East," but then the swale "curves noticeably to the South at its western end."

Judy testified that she and Charles purchased Tract 3 and Tract 4 based on "a pretty basic diagram" and that Caverly never showed her "any markers or monuments anywhere, either around [her] lot or in the general vicinity." Judy testified there was no fence between Tract 2 and Tract 4 until her son installed the meandering barbed wire fence in 1988, and they never intended the barbed wire fence to serve as the boundary line.

Judy testified that she and Charles entered into the property line agreement with the owner of Tract 1 and the owner of Tract 5 because the fences had been in place for more than 10 years. Judy also testified that the purpose of having a contractor excavate the swale in the early 1990s was not to create a boundary between Tract 2 and Tract 4, but "to allow drainage on the west side [of Tract 4] because the elevation back [t]here is quite steep."

The contractor testified that "the area had not been cleared when he started, [and] that the swale was a depression overgrown by brush." The contractor said he did

12

not excavate the swale along any particular line because he "was just directed to take the easiest path and clean up what was naturally there."

The court entered extensive findings of fact and conclusions of law. The court ruled Richard did not establish that the common grantor doctrine applied.

The court concluded the evidence did not show "that an express physical boundary had been established by Mr. Caverly and agreed to by Charles and Judy Anderson." The court rejected Curtis's testimony that "Caverly departed from this pattern [of platting square parcels] to include a meandering boundary line demarcated by the swale between Tracts 2 and 4."

The court found the testimony of Judy and her contractor credible and that neither the barbed wire fence nor the swale established the boundary between Tract 2 and Tract 4.

> The "common boundary fence" refers to a horse fence that meandered along the north portion of Tract 4. . . . The fence was not straight and was not intended to demarcate the property boundary; it was only intended to establish a horse enclosure. . . . The Court finds that there was an imprecise break between Tracts 2 and 4 and that it did not follow the swale.

The court concluded Richard did not prove that Caverly and Charles and Judy agreed to a boundary line between Tract 2 and Tract 4 "other than the one set forth in the legal description." The court found that the legal descriptions for Tracts 1 through 4 were "based upon the Voorheis Survey" but neither "Caverly nor Charles and Judy Anderson conducted a specific survey to definitively establish the boundaries of Tracts 3 and 4." The findings state, in pertinent part:

> Caverly clearly expressed his desire to plat 13 ten-acre tracts, that he did so, and that he sold Charles and Judy Anderson Tracts 3 and 4 based

13

upon his rough sketches and his legal description, not upon physical features visible to the common grantor and the buyers.

The court also ruled Richard did not establish adverse possession or mutual recognition and acquiescence.

Richard filed a motion for reconsideration and "Formal Objections To Specific Portions of the Court's Amended Findings of Fact and Conclusions of Law." The court entered amended findings of fact and conclusions of law and denied the motion for reconsideration.

Richard appeals dismissal of his counterclaim under the common grantor doctrine and denial of his motion for reconsideration.[14]

ANALYSIS

Standard of Review

We review the decision following a bench trial to determine whether substantial evidence supports the findings of fact and whether those findings, in turn, support the conclusions of law. Ridgeview Props. v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). "Substantial evidence" is the quantum of evidence "sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence." Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). We defer to the trial judge on issues of witness credibility and persuasiveness of the evidence. Boeing Co. v. Heidy,

---

[14] Richard does not appeal dismissal of the adverse possession or mutual recognition and acquiescence counterclaims. Before oral argument, Richard filed a "Motion to File Corrected Pages in Appellant's Opening Brief and Reply Brief." The motion to correct the reply brief at page 22, line 2 and at page 23, line 13 is granted. RAP 10.1(h). In all other respects, we deny the motion as an untimely attempt to make substantive changes. See In re Adoption of Doe, 45 Wn.2d 644, 647, 277 P.2d 321 (1954); Paulson v. Higgins, 43 Wn.2d 81, 82, 260 P.2d 318 (1953).

147 Wn.2d 78, 87, 51 P.3d 793 (2002); City of Univ. Place v. McGuire, 144 Wn.2d 640, 652, 30 P.3d 453 (2001). Unchallenged findings of fact are verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

Preliminarily, Judy asserts that because Richard does not assign error to any of the findings of fact, they are verities on appeal. See RAP 10.3(g) (the court only reviews a claimed error "which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto"). Without citation to authority, Richard claims he preserved his right to challenge the findings on appeal by objecting to specific findings of fact below. But Richard also asserts "this appeal is not a factual appeal at all. It is a purely legal appeal. The facts are undisputed and undisputable. Misapplication of the law is the only issue on appeal." Because Richard does not challenge the findings of fact on appeal, we treat the findings as verities.[15]

Common Grantor Doctrine

A quiet title action is an "equitable proceeding." Walker v. Quality Loan Serv. Corp., 176 Wn. App. 294, 322, 308 P.3d 716 (2013); Kobza v. Tripp, 105 Wn. App. 90, 95, 18 P.3d 621 (2001). "The goal of the court in equity is to do substantial justice and to end litigation." Carbon v. Spokane Closing & Escrow, Inc., 135 Wn. App. 870, 878-79, 147 P.3d 605 (2006). Trial courts have broad discretion to fashion equitable

---

[15] In two footnotes in his brief on appeal, Richard appears to argue substantial evidence does not support a portion of finding of fact 37 and finding of fact 47. Because " 'placing an argument of this nature in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal,' " we do not treat these arguments as assignments of error. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 497, 254 P.3d 835 (2011) (quoting St. Joseph Gen. Hosp. v. Dep't of Revenue, 158 Wn. App. 450, 472, 242 P.3d 897 (2010)). In any event, substantial evidence supports finding of fact 37—that the barbed wire fence did not demarcate the boundary between Tracts 2 and 4. The evidence at trial established there was no fence between Tract 2 and Tract 4 until Charles and Judy installed the barbed wire fence in 1988. As to finding of fact 47, Richard objects to the finding only on credibility grounds. We defer to the court on issues of credibility. Heidy, 147 Wn.2d at 87; McGuire, 144 Wn.2d at 652.

remedies. In re Proceedings of King County for the Foreclosure of Liens for Delinquent Real Property Taxes, 123 Wn.2d 197, 204, 867 P.2d 605 (1994).

The purpose of the common grantor doctrine is to protect an original grantee who acquired property in "good faith reliance on the boundary description provided by the common grantor who originally owned both lots in their entirety." Levien v. Fiala, 79 Wn. App. 294, 302, 902 P.2d 170 (1995). A property owner may establish a binding boundary line if the grantor sells the land with reference to such line, and the grantor and the original grantee agree to the identical tract of land to be transferred by the sale. Fralick v. Clark County, 22 Wn. App. 156, 159, 589 P.2d 273 (1978).

As the court states in Fralick, whether the common grantor doctrine applies "presents two problems: (1) was there an agreed boundary established between the common grantor and original grantee, and (2) if so, would a visual examination of the property indicate to subsequent purchasers that the deed line was no longer functioning as 'true' boundary?" Fralick, 22 Wn. App. at 160. To establish a binding boundary line under the common grantor doctrine,

> "it must plainly appear that the land was sold and purchased with reference to the line, and that there was a meeting of the minds as to the identical tract of land to be transferred by the sale."

Fralick, 22 Wn. App. at 159 (quoting Kronawetter v. Tamoshan, Inc., 14 Wn. App. 820, 826, 545 P.2d 1230 (1976)).

A formal agreement is not necessary if "the parties' manifestations of ownership after the sale" clearly demonstrate there was a meeting of the minds as to an agreed boundary line. Winans v. Ross, 35 Wn. App. 238, 241, 666 P.2d 908 (1983). "[T]he emphasis is on the acts and words of the grantor, who must in some way, usually by

16

pointing out, indicate that a certain line is a boundary." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.22, at 547 (2d ed. 2004).

Richard argues the court erred in applying the common grantor doctrine by treating Judy as a subsequent purchaser rather than the original grantee and improperly focusing on the question of whether a visual examination of the property established the true boundary between Tract 2 and Tract 4. The court's unchallenged findings of fact and conclusions of law do not support Richard's argument.

The court clearly addressed whether there was "an agreed boundary" between Caverly as the common grantor and Judy as the original grantee. The court rejected Richard's claim that the barbed wire fence and the swale established the boundary line between the two tracts. The court ruled that Caverly as the common grantor did not establish a boundary between Tract 2 and Tract 4 "other than the one set forth in the legal description" and there was no "agreement or meeting of the minds between Mr. Caverly and Charles and Judy Anderson regarding such a boundary." The court found that Caverly "intended to deed two square ten-acre parcels" to Charles and Judy based on the Voorheis survey, his rough sketch of the property, and the legal description.

The undisputed record establishes the Voorheis survey does not locate the boundary line between Tract 2 and Tract 4. The 1969 Voorheis survey concrete monuments mark only (1) the northeast corner of Tract 1, (2) the northwest corner of Tract 2, (3) the east end of the boundary between Tracts 1 and 3, (4) the west end of the boundary between Tracts 4 and 6, and (5) the southwest corner of Tract 8.

17

The legal description of Tract 2 and Tract 4 provides the only description of the boundary between the two tracts. The statutory warranty deed conveying Tract 2 from Boswell to Richard states, "The Northwest quarter of the Northwest quarter of the Southeast quarter of Section 22, Township 27 North, Range 6, East W.M." The 1976 statutory warranty deed conveying Tracts 3 and 4 to Charles and Judy states, in pertinent part, "The South half of the Northwest quarter of the Southeast quarter of Section 22, Township 27 North, Range 6 East, W.M." The legal description of Tract 4 as depicted on Caverly's rough sketch states, "SW ¼ NW ¼ SE ¼ Sec 22."

Judy testified that she and Charles purchased Tract 3 and Tract 4 from Caverly based on "a pretty basic diagram." The rough sketch Caverly gave to Charles and Judy does not identify survey lines or show any measurements. Judy testified Caverly did not give them, and they did not ask for, any more information. The findings also establish that Caverly and Charles and Judy "were not concerned about what they considered insignificant uncertainties about precise boundary lines."

The case Richard relies on, Light v. McHugh, 28 Wn.2d 326, 183 P.2d 470 (1947), is distinguishable. In Light, the undisputed evidence established that the common grantor sold the property to the original grantee with the express understanding that the fence had existed for more than 33 years and, as shown on a plat map, marked the south boundary of the property. Light, 28 Wn.2d at 328-29. While a subsequent survey determined the fence was not on the boundary line, the trial court found that "at all times prior to the survey, the people connected with the properties considered the old fence to be the south boundary line." Light, 28 Wn.2d at 329. On appeal, the Washington State Supreme Court held that the trial court did not err in

rejecting the line established by the survey and concluding the "true boundary lines upon the merits as shown by the undisputed evidence." Light, 28 Wn.2d at 330-31.

> It was definitely decided by the parties concerned that the southeast point of appellant's land, deeded to him by [respondent], should be thirty feet west, and one hundred fifty feet north of the southeast corner of lot three, and it was the opinion and conclusion of all concerned that the old fence line, as it connected with the east line of lot three, made the southeast corner of lot three. Appellant purchased a piece of property, and he secured just that definite parcel of real estate which was pointed out to him at the time he purchased it.

Light, 28 Wn.2d at 331.

Here, unlike in Light, there was no agreement between Caverly and Charles and Judy establishing a boundary line between Tract 2 and Tract 4 or that the barbed wire fence or the swale marked the boundary line. The undisputed record shows that in 1988, Charles and Judy's son installed a meandering barbed wire fence on Tract 4 to contain the horses. As previously described, there is no evidence that either the barbed wire fence or the swale the contractor installed were intended to demarcate the boundary between Tract 2 and Tract 4.

The findings support the court's conclusion that Caverly sold Tract 3 and Tract 4 to Charles and Judy based only on a rough sketch and a legal description that provides the only description of the boundary lines, and that there was no meeting of the minds as to a physical boundary line between Tract 2 and Tract 4 that differs from the legal description.[16] The court did not err in ruling Richard did not meet his burden of proof

---

[16] Richard does not challenge this particular conclusion of law. In fact, he characterizes it as a verity.

under the common grantor doctrine.[17]

Motion for Reconsideration

Richard contends the court abused its discretion in denying his motion for reconsideration. For the first time in the motion for reconsideration, Richard argued the "true boundary" between Tract 2 and Tract 4 was a straight line projected from the concrete monument that Voorheis placed at the southeast corner of Tract 1 rather than a curved line established by the barbed wire fence and the swale.

In opposition to the motion for reconsideration, Judy asserted Richard was raising a new claim of title based on "a straight line hypothetically projected from the Voorheis survey" rather than on an "irregularly shaped boundary" formed by the fence and the swale.[18]

In reply, Richard conceded that he "sought more than just the Voorheis Survey line" at trial by asserting title to "that additional area" where the swale curves to the south. But Richard argued that he presented evidence to support a straight boundary line theory at trial by attempting to show that the eastern 350 feet of the barbed wire fence and the swale were installed based on the Voorheis survey and its concrete monuments.

The court denied the motion on the grounds that Richard's argument on reconsideration was "inconsistent" with "the position [Richard] took throughout the trial: that the Court should recognize a visual line and reform the legal description based upon that evidence pursuant to the common grantor doctrine."

---

[17] Richard also asserts the court erred in requiring him to prove the common grantor doctrine by clear, cogent, and convincing evidence. However, because the court specifically found that it "would reach the same conclusion, even if the burden of proof were based on a preponderance of the evidence," we need not address this argument.

[18] Emphasis in original.

Motions for reconsideration are addressed to the sound discretion of the trial court. Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122 P.3d 729 (2005). We will not reverse denial of a motion for reconsideration absent a manifest abuse of discretion. Wilcox, 130 Wn. App. at 241. CR 59 does not permit a plaintiff to propose new theories of the case that could have been raised before entry of an adverse decision. Wilcox, 130 Wn. App. at 241. The court did not manifestly abuse its discretion in denying the motion for reconsideration.

We affirm the trial court's decision and entry of the judgment dismissing the counterclaims.

WE CONCUR:

_Leach, J._

_Appelwick, J._